2008 WY 84

**In the Matter of the Worker's Compensation Claim of Bradley M. DALE, Appellant (Petitioner),**

v.

**S & S Builders, LLC, Appellee (Employer),**

and

**State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellee (Respondent).**

No. S–07–0145.

Supreme Court of Wyoming.

July 18, 2008.

Representing Appellant: Lynn Boak, Cheyenne, Wyoming.

Representing Appellee S & S Builders, LLC: J. Stan Wolfe, Gillette, Wyoming.

Representing Appellee State of Wyoming ex rel. Wyo. Workers' Safety & Comp. Div.: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, JJ., and GUTHRIE, D.J.

KITE, Justice.

[¶ 1]   Bradley M. Dale appeals from the district court's order affirming the Office of Administrative Hearings (OAH) denial of his claim for worker's compensation benefits related to an infection in his right knee.   Contrary to Mr. Dale's contention, the OAH did not commit a fundamental error by comparing his testimony during two parts of the contested case hearing.   In addition, the OAH decision was supported by substantial evidence.   We affirm.

## ISSUES

[¶ 2]   Mr. Dale presents two issues on appeal:

1.   Are the Hearing Examiner's Findings of Fact, Conclusions of Law and Order denying benefits arbitrary, capricious or an abuse of discretion?

2. Was it a fundamental error for the hearing examiner to acknowledge that due to his prescription medication the Appellant "was not always coherent in his testimony" and recess the hearing, then make ultimate findings of fact in which discrepancies in the Appellant's testimony between the first segment and the second segment of the hearing were used?

Although phrased somewhat differently, the issues presented by S & S Builders, LLC (Employer) and State of Wyoming ex rel. Wyoming Workers' Safety and Compensation Division (State) are substantially the same as Mr. Dale's.

## FACTS

[¶ 3] In the summer of 2004, Mr. Dale worked for Employer as a truck driver and heavy equipment operator. Mr. Dale had a history of serious problems with, and extensive medical treatment to, his right knee including at least fourteen surgeries and three total knee replacements. Because of his knee problems, Mr. Dale was restricted from performing manual labor for Employer.

[¶ 4] On August 4, 2004, Mr. Dale's supervisor, Rick Potter, directed him to "baby sit" a silica fume concrete pour on a bridge outside of Laramie, Wyoming. The pour had been completed the night before, but it needed to be watched to ensure the concrete remained moist while it cured. Mr. Dale was using a water truck to keep the concrete moist and he filled the truck from the river below the bridge. When the truck was full, he climbed to the top to disconnect the hose. As he was climbing back down, he slipped and injured his right knee. He claimed that the slip caused severe pain, swelling and a minor scrape on his knee.

[¶ 5] Mr. Dale consulted several different physicians over the next few months because of his pain and concern that he had loosened his knee prosthesis when he slipped on August 4, 2004. None of the physicians' records referenced a scab or wound on his knee until he saw Kirk Kindsfater, M.D. in early November 2004. Dr. Kindsfater cultured the wound and referred Mr. Dale to a wound care clinic. The results of the culture were positive for a staphylococcus aureus (staph) infection. David Cobb, M.D., a wound care specialist, immediately hospitalized Mr. Dale and began aggressive treatment to counter the infection. While he was in the hospital, Mr. Dale filled out a report of injury, indicating that he had injured his right knee when he slipped on the truck on August 4, 2004.

[¶ 6] The State initially opened a case for the injury. The Employer, however, objected and the State apparently later joined in that objection. The OAH convened a contested case hearing on February 16, 2006, and, after Mr. Dale's direct testimony, continued the hearing because the hearing examiner was concerned about Mr. Dale's ability to proceed.

[¶ 7] After the second part of the hearing on June 14, 2006, the OAH issued a denial of Mr. Dale's claims, ruling that he had not met his burden of proving the infection was causally related to his work-related injury on August 4, 2004. Mr. Dale filed a petition for review with the district court, and the district court affirmed the OAH decision. Mr. Dale then appealed to this Court.

## STANDARD OF REVIEW

[¶ 8] When we consider an appeal from a district court's review of an administrative agency's decision, we give no special deference to the district court's decision. Instead, " 'we review the case as if it had come directly to us from the administrative agency.' " *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2002 WY 91, ¶ 7, 49 P.3d 163, 166 (Wyo.2002), quoting *French v. Amax Coal West,* 960 P.2d 1023, 1027 (Wyo. 1998). Our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2007).

[¶ 9] In *Newman,* we attempted to clarify the standards of review applicable to administrative cases in order to dispel the general confusion in our case law regarding the application of the very specific statutory language in § 16–3–114(c)(ii). That statutory provision states:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statuto-

ry provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) **Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;**

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) **Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.**

Section 16–3–114(c) (emphasis added). We remarked that the arbitrary or capricious standard and the substantial evidence tests had been muddled in cases when agency decisions are reviewed. The blurring of these concepts had "led to the citation of every possible administrative review standard in a scattergun effort to hit the target." *Newman*, ¶ 8, 49 P.3d at 166. Moreover, the case law had failed to give separate effect to the distinct standards of review stated in § 16–3–114(c).

[¶ 10] We attempted to provide guidance as to when the different standards should be applied. *Newman's* salient teachings included:

[W]e hold the substantial evidence test is the appropriate standard of review in appeals from WAPA contested case proceedings when factual findings are involved and both parties submit evidence. We further hold, when only the party with the burden of proof submits evidence in the contested case proceeding and that party

does not ultimately prevail, the arbitrary or capricious standard governs the judicial review of that agency decision.

Despite this holding, even if the factual findings are found to be supported by substantial evidence, the ultimate agency decision could still be found to be arbitrary or capricious for other reasons. The arbitrary or capricious standard works as a "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other WAPA review standards yet is not easily categorized or fit to any one particular standard. Section 16–3–114(c)(ii); *Community Savings and Loan Association of College Station, Texas v. Vandygriff*, 630 S.W.2d 457, 459 n. 3 (Tex.App.1982).

*Id.*, ¶¶ 22–23, 49 P.3d at 171–72 (footnote omitted). We noted that identification of the correct standard of review is important because, although both the substantial evidence and arbitrary and capricious standards require review of the entire record, they compel the reviewing court to apply different tests to the record. *Id.*, ¶ 19, 49 P.3d at 170.

[¶ 11] The substantial evidence test is described as:

"In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence."

*Id.*, ¶ 12, 49 P.3d at 168, quoting *State ex rel. Wyo. Workers' Safety and Comp. Div. v. Jensen*, 2001 WY 51, ¶ 10, 24 P.3d 1133, 1136 (Wyo.2001) (citations omitted). In addition, we explained in *Newman*, ¶ 26, 49 P.3d at 173, that in conducting a substantial evidence review of the record,

the deference that normally is accorded the findings of fact by a trial court is extended to the administrative agency, and we do not adjust the decision of the agency unless it is clearly contrary to the over-

whelming weight of the evidence on record. This is so because, in such an instance, the administrative body is the trier of fact and has the duty to weigh the evidence and determine the credibility of witnesses.

*See also, City of Casper v. Wyo. Dep't of Employment,* 851 P.2d 1, 3 (Wyo.1993); *Board of Trustees of Laramie County School Dist. No. 1 v. Spiegel,* 549 P.2d 1161, 1178 (Wyo.1976).

[¶ 12] We also held that the arbitrary and capricious standard is appropriate to review evidentiary issues when only the party with the burden of proof submitted evidence and did not prevail. The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. *Newman,* ¶ 19, 49 P.3d at 170. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because "it requires only that there be a rational basis for the agency's decision." *Id.*

[¶ 13] We determined that the arbitrary and capricious standard should apply when there is no disputed evidence on an issue because the substantial evidence test is awkward when applied to a finding for the non-burdened party. *Id.,* ¶ 21, 49 P.3d at 171. In *Newman,* we referred to a Pennsylvania Commonwealth Court case, *Russell v. Workmen's Compensation Appeal Board (Volkswagon of America),* 121 Pa.Cmwlth. 436, 550 A.2d 1364, 1365 (1988) because it had grappled with the same problem. The court in *Russell* rightly pointed out that:

> where the burdened party is the only party to present evidence and does not prevail before the agency, the "substantial evidence" test falters. If no evidence was presented to support the prevailing party, there is no evidence upon which to apply the "substantial evidence" test: *i.e.,* it is impossible to find substantial evidence to support a position for which no evidence was introduced.

*Newman,* ¶ 21, 49 P.3d at 171 (quoting *Russell,* 550 A.2d at 1365–66).

[¶ 14] The *Russell* court stated, and we quoted in *Newman,* that in cases where the prevailing party presented no evidence, "the appropriate scope of review … is whether the agency erred as a matter of law or capriciously disregarded competent evidence." *Newman,* ¶ 21, 49 P.3d at 171. Partially relying on *Russell's* reasoning, we concluded it was appropriate to apply the "arbitrary or capricious" language from our own statutory standards in such situations. *Id.,* ¶ 22, 49 P.3d at 171.

[¶ 15] The Pennsylvania Supreme Court has since noted the difficulty in following that approach and decided that the exception created in *Russell,* which hinged application of the "capricious disregard of the evidence" standard of review on whether the non-burdened party presented evidence, is not necessary because that standard could apply in any case, as it was a subset of Pennsylvania's statutory requirement that the agency decision must be in "accordance with law." *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe),* 571 Pa.189, 812 A.2d 478, 488 n.13 (2002).

[¶ 16] Application of the arbitrary and capricious standard of review to basic evidentiary issues has also caused problems for Wyoming courts. It is often difficult to determine whether both parties or only the party with the burden of proof presented evidence. This is especially true when the respondent party does not present a case at the contested case hearing, but, instead, relies upon cross examination of the other party's witnesses to defeat the claim. Moreover, it can be confusing and cumbersome to apply different standards of review to what are essentially evidentiary questions.

[¶ 17] The case at bar clearly illustrates these difficulties. The parties submit that the applicable standard of review is the arbitrary and capricious standard because the dispositive ruling by the hearing examiner was that the claimant did not meet his burden of proof. They refer to *Boyce v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2005 WY 9, ¶ 6, 105 P.3d 451, 454 (Wyo.2005) to support their positions. *Boyce* has been misconstrued as holding that, in all cases

where the hearing examiner rules that the claimant failed to meet his burden of proof, the arbitrary and capricious standard applies. In fact, we applied the arbitrary and capricious standard in *Boyce* because the OAH decision was based on a misapplication of the law. *Id.*, ¶ 6, 105 P.3d at 454. The hearing examiner had concluded the claimant was required to present expert medical testimony to establish that her work conditions "materially or substantially" contributed to her injury. *Id.*, ¶ 9, 105 P.3d at 454. Because Ms. Boyce did not present expert testimony using that precise terminology (her doctors testified her work "aggravated" her condition), the hearing examiner concluded she had not satisfied her burden of proof. *Id.* We used the arbitrary and capricious standard because the underlying problem was that the OAH misapplied the law and that error led to an arbitrary finding that the claimant had not met her burden of proof. The *Boyce* decision does not, therefore, support use of the arbitrary and capricious standard anytime the hearing examiner couches his ruling in terms that the claimant failed to meet his burden of proof.

[¶ 18] Since then, we have, in some cases, perpetuated the confusion by relying on *Boyce* as authority to apply the arbitrary and capricious standard of review to evidentiary determinations simply because the hearing examiner's ultimate ruling was that the party with the burden of proof did not satisfy it. *See, e.g., State ex rel. Wyo. Workers' Safety & Comp. Div. v. Slaymaker*, 2007 WY 65, 156 P.3d 977 (Wyo.2007); *Spletzer v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, 116 P.3d 1103 (Wyo.2005) and *Taylor*

*v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, 123 P.3d 143 (Wyo.2005) (referring to both the substantial evidence and arbitrary and capricious standards of review); *David v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2007 WY 22, 151 P.3d 280 (Wyo.2007) (applying arbitrary and capricious standard because the hearing examiner ruled the claimant had not met his burden of proof).

[¶ 19] While our analysis in *Newman* was, and continues to be, supported by credible authorities, the difficulty we have had in consistently applying the standards convinces us that we need to further refine our standards of judicial review for agency actions. We will, however, remedy this problem differently than the Pennsylvania Supreme Court did in *Leon*.

[¶ 20] The judicial review provision of the federal Administrative Procedures Act, 5 U.S.C. § 706,[1] is similar to § 16–3–114(c). Historically under the federal act, the arbitrary and capricious standard was used to review informal adjudications. 33 Fed. Prac. & Proc., Judicial Review § 8334. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1214–17 (10th Cir.1997), demonstrates the traditional use of the arbitrary and capricious standard of review in adjudicative contexts. In that case, the Tenth Circuit Court of Appeals applied the arbitrary and capricious standard of review in 5 U.S.C. § 706 to review an agency's decision after an informal proceeding involving a timber sale. *See also, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). On the other hand, the substantial evidence standard has traditional-

---

1. 5 U.S.C. § 706 states:

   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-
   (1) compel agency action unlawfully withheld or unreasonably delayed; and
   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;

   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   (D) without observance of procedure required by law;
   (E) unsupported by substantial evidence in a case subject to *sections 556* and *557* of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

   In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

ly been applied to review evidentiary findings after formal, trial-type agency proceedings. 33 Fed. Prac. & Proc., Judicial Review §§ 8333.

[¶ 21] Section 16–3–114(c)(ii) provides only one evidentiary standard of review. Under the plain language of the statute, reversal of an agency finding or action is required if it is "not supported by substantial evidence." Because contested case hearings under Wyoming's Administrative Procedures Act, are formal, trial-type proceedings, use of the substantial evidence standard for review of evidentiary matters is more in keeping with the original intent of the drafters of the administrative procedures act. 33 Fed. Prac. & Proc., Judicial Review §§ 8333, 8334.

[¶ 22] Thus, in the interests of simplifying the process of identifying the correct standard of review and bringing our approach closer to the original use of the two standards, we hold that henceforth the substantial evidence standard will be applied any time we review an evidentiary ruling. When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. *See, Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.*, 882 P.2d 858, 860–61 (Wyo.1994); *Spiegel,* 549 P.2d at 1178 (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

[¶ 23] The arbitrary and capricious standard remains a " "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Newman,* ¶ 23, 49 P.3d at 172. Although we explained the "safety net" application of the arbitrary and capricious standard in *Newman,* we will refine it slightly here to more carefully delineate that it is not meant to apply to true evidentiary questions. Instead, the arbitrary and capricious standard will apply if the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law. This listing is demonstrative and not intended as an inclusive catalog of all possible circumstances. *Id.*

[¶ 24] There will be times when the arbitrary and capricious standard appears to overlap with some of the other standards. For example, a decision against the great weight of the evidence might properly be called arbitrary or capricious in everyday language. However, the words "arbitrary" and "capricious" must be understood in context as terms of art under the administrative review statute and should not be employed in areas where the more specifically defined standards provide sufficient relief.

[¶ 25] In summary, while we believe *Newman* was analytically correct and supported by relevant authorities, application of the different standards of review to evidentiary matters proved confusing and led to arguably inconsistent decisions. Thus, we take this opportunity to diverge somewhat from *Newman* in order to simplify the process of determining the proper standard of review for both litigants and courts. In the future, we will apply the substantial evidence standard anytime we are reviewing an evidentiary issue.

[¶ 26] As always, we review an agency's conclusions of law *de novo,* and

" '[w]e will affirm an agency's legal conclusion only if it is in accordance with the law.' " *Diamond B Servs., Inc. v. Rohde,* 2005 WY 130, ¶ 12, 120 P.3d 1031, 1038 (Wyo.2005), quoting *DC Prod. Serv. v. Wyo. Dep't of Empl.,* 2002 WY 142, ¶ 7, 54 P.3d 768, 771 (Wyo.2002).

[¶ 27] In this case, Mr. Dale challenges the hearing examiner's evidentiary determination on disputed evidence that his staph infection was not caused by a work related injury. Consistent with our discussion above, we will review that factual determination for substantial evidence, or, in other words, for relevant evidence that a reasonable mind might accept in support of the hearing examiner's decision.

## DISCUSSION

[¶ 28] In order to facilitate the discussion and ensure that we focus only on appropriate evidence in reviewing the OAH decision, we will consider Mr. Dale's issues in reverse order.

### 1. Hearing Procedure

[¶ 29] The OAH initially convened the contested case hearing on February 16, 2006. At the conclusion of Mr. Dale's direct testimony, the hearing examiner expressed concern about his ability to continue with the hearing. The hearing examiner remarked that he "became concerned about halfway through Mr. Dale's testimony" that Mr. Dale's pain was making him unable "to adequately proceed and testify in this matter." He expressed concern that Mr. Dale would not be able to accurately answer questions. All of the parties agreed with the hearing examiner, and the hearing was continued until June 14, 2006.

[¶ 30] At the June 14th hearing, Mr. Dale stated that he felt a lot better than he had at the prior hearing. The hearing examiner ruled that he could have another opportunity to testify in direct examination:

I would note that when we suspended the proceedings in February, Mr. Santini had just finished his direct of Mr. Dale. However, the State has indicated that it doesn't object to additional evidence. And given

the passage of time and the events of that day, I will give Mr. Santini another bite if he feels that there is anything else he wishes to ask his client before we proceed to cross-examination.

Mr. Dale then testified briefly on direct examination.

[¶ 31] On appeal, Mr. Dale claims that the hearing examiner committed fundamental error by comparing his testimony in the first segment of the hearing to his testimony in the second segment. An example of the hearing examiner's reliance on the discrepancies in Mr. Dale's testimony is: "Dale's description of the scrape was not clear and Dale changed his testimony between the first hearing and the second hearing in this matter. Dale initially testified there was no blood when he observed the scrape, but later changed his testimony stating he observed a small amount of blood."

[¶ 32] Mr. Dale suggests that the hearing examiner violated his due process rights by failing to strike his testimony in the first segment of the hearing from the record and allowing him to start over. He analogizes to the situation in *deShazer v. State,* 2003 WY 98, ¶ 25, 74 P.3d 1240, 1250–51 (Wyo.2003). In that case, we ruled the district court had violated the criminal defendant's due process rights when it failed to suspend the trial and order a mental competence evaluation when there were indications he was not competent to proceed. In *deShazer,* the defendant was entitled to the protection of the competence statutes, Wyo. Stat. Ann. §§ 7–11–301 through 7–11–307 (LexisNexis 2007). There are, however, no comparable statutes which require competency evaluations in workers' compensation cases.

[¶ 33] As Employer points out, Mr. Dale did not request that his testimony from the first part of the hearing be struck from the record. Instead, he accepted, without objection, the hearing examiner's invitation to continue his direct examination at the second segment of the hearing. As we have stated previously:

[a] party is obligated to object at the agency level to the administrative tribunal's procedure so that the tribunal will

have an opportunity to correct its errors. [*State ex rel., Wyoming Workers' Safety and Compensation Division v.*] *Wright*, 983 P.2d [1227,] 1231 [ (Wyo.1999) ]. If a party has an opportunity to object to the administrative tribunal's procedural rulings and fails to do so, it waives its right to challenge the administrative tribunal's procedure on appeal. *Id.*

*Amoco Prod. Co. v. Wyo. State Bd. Of Equalization,* 7 P.3d 900, 906 (Wyo.2000). Mr. Dale was given an ample opportunity to be heard and, in the absence of an objection, he waived his right to contest the hearing examiner's procedural ruling. Because both segments of the hearing were part of the evidentiary record, the hearing examiner appropriately referred to both and noted inconsistencies in Mr. Dale's testimony.

[¶ 34] Moreover, we do not believe that Mr. Dale was prejudiced by the hearing examiner considering both portions of the hearing in reaching his decision. While the hearing examiner did note some minor discrepancies in Mr. Dale's testimony, especially regarding the circumstances of how he scraped his knee and the extent of his August 4, 2004, injury, those discrepancies were not the sole or even primary reason for the hearing examiner's decision. As will be explained in detail below, the record includes substantial other evidence to support the agency decision.

### 2. *Work–Related Injury*

[¶ 35] The claimant has the burden of proving each of the essential elements of his claim by a preponderance of the evidence. *Sherwin–Williams Co. v. Borchert,* 994 P.2d 959, 963 (Wyo.2000). As a part of that burden, the claimant must prove a causal connection exists between a work-related injury and the injury for which worker's compensation benefits are being sought. That determination involves a question of fact. *Taylor,* ¶ 9, 123 P.3d at 146; *Morgan v. Olsten Temp. Servs.,* 975 P.2d 12, 16 (Wyo. 1999).

[¶ 36] The dispositive findings of fact contained in the OAH order state:

32. This Office finds Dale did not meet his burden of proving, by a preponderance of the evidence, his November 2004 right knee infection and subsequent treatment was directly related to his August 4, 2004 injury. Dale's description of the scrape was not clear and Dale changed his testimony between the first hearing and the second hearing in this matter. Dale initially testified there was no blood when he observed the scrape, but later changed his testimony stating he observed a small amount of blood. When Dale informed his employer he had hurt his right knee he only mentioned the twisting and pain and made no mention of the scrape. Potter testified he saw Dale in the late afternoon of August 4, 2004 and knew Dale's right knee was hurting, but observed no evidence of blood in the area of Dale's right knee.

33. Dale underwent numerous medical examinations from August 20, 2004 until November 5, 2005. The physicians' notes of Dale's numerous examinations provide [a] very detailed explanation of Dale's physical examinations and in none of the notes are there any indication[s] of a scab or scrape on Dale's right knee. Further, the fluid drained from Dale's knee in September 2004 was negative for infection. Additionally, Dale informed both Dr. Kindsfater and Dr. Cobb the scrape of his right knee occurred approximately two weeks before his November 5, 2004 examination.

34. Dr. Basta wrote a December 16, 2004 letter to the Division indicating Dale had a scrape on his right knee when examined on August 20, 2004, but admitted she had no recollection of the scrape and Dr. Basta's statement may have been based upon something Dale told her when Dale requested Dr. Basta to write the letter. Dr. Co[bb] testified he believed Dale's infection was related to the August 2004 work injury, but admitted his testimony was speculative and only based upon

Dale's history of the scrape waxing and waning. Dr. Co[bb] admitted he had no objective evidence relating Dale's infection to the August 4, 2004 injury. Dr. Kindsfater testified he did not believe Dale's infection was related to the August 4, 2004 work incident. Dr. Kindsfater based his opinion on the timing of the infection and Dale's own admission he had scraped his right knee only two weeks before the November 5, 2004 examination.

35. Based upon Dale's inability and inconsistency in describing the scrape, the lack of any notation of the scrape in any medical reports prior to November 5, 2004, the September 2004 tests showing no knee infection, Dale's statement [to] two of his doctors that he had scraped his knee only two weeks before the November 5, 2004 examination and the clear testimony of Dr. Kindsfater, this office must find Dale has failed to meet his burden of proof to show his right knee infection was related to his August 4, 2004 injury.

We review the entire record to determine whether substantial evidence exists to support the hearing examiner's evidentiary finding that Mr. Dale's staph infection was not related to his August 4, 2004, work related injury.

[¶ 37] Both Mr. Dale and his supervisor, Mr. Potter testified that he reported an injury to his right knee on August 4, 2004. Mr. Dale testified that he injured his knee while climbing down from the top of the water truck. He claimed that he scraped his knee. During both parts of the hearing, Mr. Dale testified that the scrape was minor, although his description of the injury varied a little from the first to the second part of the hearing. At the first part of the hearing, he testified there was no blood; during the second part of the hearing, he stated there was a small amount of blood.

[¶ 38] Mr. Potter testified that Mr. Dale had simply told him that he had slipped and bumped his knee while climbing down the ladder. He was not aware that Mr. Dale had also scraped the knee. Thus, it was undisputed that Mr. Dale slipped climbing off the truck, striking his right knee against something and that he reported the injury to Employer on August 4, 2004.[2] What was in dispute was whether he scraped his knee on that day and whether that same scrape became infected with staph.

[¶ 39] Mr. Dale continued to have problems with his knee through the late summer and fall of 2004; however, he testified the scrape did not bother him very much. He explained that the scab would "go away" and then return. Mr. Dale testified that his real concern was the condition of his prosthetic implant.

[¶ 40] Mr. Dale went to Harlan Ribnik, M.D.'s office on August 20, 2004. Dr. Ribnik was a pain consultant whom Mr. Dale had been seeing for continuing pain in his right knee. Dr. Ribnik's medical records indicate that the examination of his extremities that day did not reveal any changes from his June 25, 2004, examination. No scrape or wound was noted on his knee. At the contested case hearing, Mr. Dale testified that often his knee was not actually examined in Dr. Ribnik's office.

[¶ 41] On September 28, 2004, he saw Jean Basta, M.D., an orthopedic surgeon. Dr. Basta's medical records indicate that she conducted a thorough examination of Mr. Dale's right knee. She did not, however, document any wound or scrape on the knee. Dr. Basta was concerned that Mr. Dale had loosened the prosthesis and ordered further tests. One of the tests involved withdrawing synovial fluid and testing it for infection. The results of that test were negative.

[¶ 42] Mr. Dale again visited Dr. Ribnik's office on October 15, 2004. The notes from that visit indicate that Mr. Dale had been experiencing worsening pain since he fell from a water truck. Although the notes state that Mr. Dale was physically examined,

2. The record also contains evidence regarding another work-related injury on August 30, 2004. Mr. Dale apparently hyper-extended his knee that day. There is no indication that the August 30th incident had any effect on the right knee scrape or infection.

there was no reference to a scrape, abrasion or wound on his right knee.

[¶ 43]  On November 5, 2004, Mr. Dale saw Dr. Kindsfater.  His notes stated that Mr. Dale suffered from chronic knee pain attendant to his prior surgeries and that "a slip at work in August . . . injured this knee and has exacerbated his symptoms to some degree."  Also, for the first time, there was a mention of a wound on the knee:

CLINICAL FINDINGS:  On exam today [Mr. Dale] is a pleasant gentleman.  He actually has an eschar [3] over the distal portion of one of his old wounds.  He says he scraped this a couple of weeks ago.  It was just a superficial scrape but now it has turned into rather a full thickness skin lesion with an eschar.  I can express just a little bit of goopy type pus from underneath this.  There is a mild surrounding erythema but nothing seems to be affecting the knee or deeper tissues.  I did go ahead and culture this . . . .

(footnote added).  Because the doctor was concerned about the scab, he referred Mr. Dale to a wound care clinic.

[¶ 44]  Mr. Dale saw David K. Cobb, M.D. at the Wound Healing Clinic associated with the Poudre Valley Hospital in Fort Collins, Colorado on November 9, 2004.  A patient intake form indicated that Mr. Dale said he had had the scrape for two weeks.  By the time Mr. Dale saw Dr. Cobb, the results of the culture had been returned and indicated he had a staph infection.  Dr. Cobb immediately admitted Mr. Dale to the hospital for aggressive treatment of his infection.  A bone scan performed in the hospital indicated that the infection may have invaded the tibia bone.

[¶ 45]  Dr. Basta's deposition testimony was admitted into evidence at the contested case hearing.  She provided no opinion on the cause of Mr. Dale's right knee infection.  Dr. Basta was questioned about a letter she wrote to the State on December 16, 2004, stating that Mr. Dale had a skin lesion on his knee as a result of an injury on August 10, 2004.  However, on cross-examination she confirmed that the notes from her September

28, 2004, examination of Mr. Dale did not mention a skin lesion.  Dr. Basta also admitted she could not remember if she had actually seen the skin lesion.

[¶ 46]  Dr. Kindsfater also testified by deposition at the hearing.  Dr. Kindsfater testified that he observed a scab or eschar on Mr. Dale's right knee on November 5, 2004.  He stated that Mr. Dale told him he had scraped his knee "a couple of weeks ago.  And he said initially it was just a superficial scrape, but then it turned into more than that as time went on."  Dr. Kindsfater testified that he believed the fall in August probably exacerbated his symptoms, but that it was unlikely that the knee prosthesis had been loosened.  He also testified that he "would not expect that to cause deep infection."  With regard to the wound, he stated: "It's my recollection, I think that when he got the scrape on his wound was—I don't believe that it was at the time that he slipped.  I thought it was later.  But I'm not sure about that."

[¶ 47]  Dr. Cobb's deposition testimony was also admitted into evidence at the contested case hearing.  Dr. Cobb testified Mr. Dale told him that he had scraped his knee getting out of a truck in August, and that "it sounded as if it had been a waxing and waning process that had developed into this or evolved into this wound that was not healing."  Dr. Cobb also testified that, based upon the history Mr. Dale had given him, "over the preceding few weeks, the process had been that of progressive worsening."  Dr. Cobb testified that Mr. Dale's description of an injury that waxed and waned over time was consistent with an indolent type of staph infection.  When specifically questioned about the origin of Mr. Dale's staph infection, Dr. Cobb testified as follows:

Q.  How can you tell in Mr. Dale's case whether that infection you saw in November of 2004 was of recent origin versus something that has been there a longer period of time?

A.  Define longer period of time.

Q.  Let me say from August of 2004 versus mid-October 2004?

3.  An eschar is "a dry crust or scab."  Webster's   Third New Int'l Dictionary 775 (2002).

A. Well, that's—admittedly, that is very inexact. And I can't claim to have a corner on truth about this; however, I do think that the fact that the bone scan showed up positive—showing up positive in early November, to me, would be more suggestive that the infection had been there in some form or fashion for at least a period of multiple weeks if not a few months .... as opposed to having had this indolent infection just develop a couple of weeks before.

[¶ 48] On cross-examination, Dr. Cobb acknowledged that Mr. Dale's patient intake form indicated that he had received the scrape approximately two weeks before and had been treating it with hydrogen peroxide. Dr. Cobb also stated that the only source of information he had about the relationship between the August injury and the November infection was the history Mr. Dale provided. Finally, he testified:

Q. Doctor, in terms of when the wound occurred, based on your objective findings, we'd be asking you to speculate, correct?

A. I think so.

[¶ 49] It is abundantly clear from the parts of the record described above that the evidence in this case was extensive and complex. There was evidence indicating that the wound occurred as Mr. Dale contended in August 2004. However, there was also evidence, especially the medical evidence from doctors Ribnik, Basta, and Kindsfater, indicating that he did not have a wound during the late summer and early fall of 2004. It was the hearing examiner's responsibility to determine the credibility of the witnesses and weigh the evidence, including that obtained from medical experts. *Id.*, ¶ 16, 123 P.3d at 148; *Morgan*, 975 P.2d at 16. The hearing examiner weighed the evidence and concluded there was no causal connection between the August 4, 2004, work related injury and the staph infection diagnosed in November 2004.

[¶ 50] Mr. Dale claims that the hearing examiner improperly discounted Dr. Cobb's testimony that he believed the infection was causally related to the August 4, 2004, injury. "[A] hearing examiner is entitled to disregard an expert opinion if he finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant." *Taylor*, ¶ 15, 123 P.3d at 148. *See also, Franks v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 77, ¶ 18, 46 P.3d 876, 879–80 (Wyo.2002); *Clark v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 934 P.2d 1269, 1271 (Wyo.1997). The hearing examiner had a justifiable basis for refusing to accept Dr. Cobb's opinion. Dr. Cobb admitted that he had to speculate in order to opine that the staph infection was caused by the August 4, 2004, work related injury. Moreover, he conceded that he relied solely on the history Mr. Dale related in reaching that conclusion and that Mr. Dale's intake form indicated he had only had the wound for two weeks prior to his appointment with Dr. Cobb. Those factors, coupled with the fact that, until Dr. Kindsfater examined Mr. Dale on November 5, 2004, none of the health care providers who had examined him since August had even mentioned a wound, supports the hearing examiner's decision.

[¶ 51] After examining the conflicting and contradictory evidence, we conclude that there is substantial evidence, or relevant evidence that a reasonable mind might accept, to support the hearing examiner's decision that there was no causal connection between Mr. Dale's staph infection diagnosed in November, 2004 and his August 4, 2004, work related injury. The hearing examiner, therefore, properly denied Mr. Dale's claim.

[¶ 52] Affirmed.