2012 WY 89

Vic and Jane GARBER; Sandra Lange, Trustee of the Sandra K. Lange Trust; Fred and Wendy Larson; Fred Smith; Michael and Nita Werner; Ross and Biff Gorman; Dr. Kirby Kirkland; and Dave And Glynda Edwards, Appellants (Petitioners),

v.

WAGONHOUND LAND & LIVESTOCK COMPANY, LLC; VenJohn Oil, Inc., and Steven M. VenJohn, Appellees (Respondents).

No. S–11–0006.

Supreme Court of Wyoming.

June 22, 2012.

this Court. We conclude that the Board's decision is supported by substantial evidence and is consistent with the law; consequently, we affirm.

Representing Appellants: Harriet M. Hageman and Kara Brighton of Hageman & Brighton, P.C., Cheyenne, Wyoming. Argument by Ms. Hageman.

Representing Appellee Wagonhound Land & Livestock Company, LLC: Robert G. Berger and Mistee L. Godwin of Lonabaugh and Riggs, LLP, Sheridan, Wyoming. Argument by Ms. Godwin.

Representing Appellees VenJohn Oil, Inc. and Steven M. VenJohn: No appearance.

Before KITE, C.J., and GOLDEN, HILL, and BURKE, JJ., and STEBNER, D.J., Retired.

KITE, Chief Justice.

[¶ 1] Wagonhound Land and Livestock Company, LLC (Wagonhound), VenJohn Oil, Inc., and Steven M. VenJohn (VenJohn) (collectively Applicants) filed a petition with the Wyoming State Board of Control (Board) seeking to change the place of use, point of diversion and means of conveyance for water appropriations attached to 174.8 acres. VenJohn owned the appropriations from the North Platte River and requested that the point of diversion and place of use of the rights be moved upstream to Wagonhound's land. Vic and Jane Garber, et al. (Objectors), who were intervening water right holders, objected to the petition, and the Board held a contested case hearing. The Board granted the Applicants' petition but reduced the transferred rights to 152.5 acres.

[¶ 2] The Objectors petitioned the district court for review of the Board's decision, and that court affirmed. They then appealed to

## ISSUES

[¶ 3] The Objectors present the following issues on appeal:

1. Whether the final decision of the Board of Control was supported by substantial evidence in the record.

2. Whether the final decision of the Board of Control was in violation of Wyo. Stat. § 41–3–104.

3. Whether the final decision of the Board of Control was in violation of Wyo. Stat. § 41–3–114.

The Applicants articulate a single issue: [1]

I. Whether the decision of the Board of Control to grant in part and deny in part the Petition was supported by substantial evidence, and was not arbitrary, capricious, an abuse of discretion or contrary to law, in accordance with Wyo. Stat. § 16–3–114(c).

## FACTS

[¶ 4] On October 4, 2007, Wagonhound and VenJohn filed a petition with the Board seeking to change the place of use, point of diversion and means of conveyance of water appropriations attached to 174.8 acres. The petition requested the transfer of VenJohn's water rights approximately thirty miles upstream from his land near Orin Junction to lands owned by Wagonhound northwest of Douglas, Wyoming. The Applicants proposed that additional water rights owned by Wagonhound be combined with the VenJohn rights to fill out acreage to be irrigated under three center pivot sprinklers on Wagonhound's land.

---

1. The Applicants argued in the district court that the Objectors did not have standing to appeal the Board's decision because their alleged injuries from the requests in the petition were speculative. The Applicants, however, do not squarely present that argument on appeal to this Court. At any rate, we conclude that the Objectors have standing to appeal under Wyo. Stat. Ann. § 16–3–114(a) as they were "aggrieved or adversely affected in fact by a final decision of an agency in a contested case." Stated simply, the Objectors' interest is clearly shown by the fact that the Board accepted, to some extent, their argument that the intervening water right owners would be injured by a full transfer of VenJohn's water rights to Wagonhound. The Objectors' claim that the Board should have ordered additional reductions of the transferred water right confirms that they were adversely affected by its decision.

[¶ 5] The Objectors contested the petition on the ground that it violated the statutes governing changes in place of use, Wyo. Stat. Ann. § 41–3–104 (LexisNexis 2011), and changes in point of diversion and means of conveyance, Wyo. Stat. Ann. § 41–3–114 (LexisNexis 2011). They argued the petition was defective on its face because, with respect to the change of point of diversion and means of conveyance, the petition did not fully identify ownership of the appropriation or correctly state whether VenJohn was the sole owner of the facilities involved or had obtained the consent of other owners, as required by § 41–3–114. With respect to the change in place of use, Objectors contended that granting the petition would violate § 41–3–104 and injure them because the transferred water right would exceed the quantity of water historically diverted under the existing use; exceed the historic rate of diversion; increase the historic amount consumptively used; and decrease the historic amount of return flow.

[¶ 6] The Objectors further contended that granting the petition would decrease flows available to them because the new diversion point was upstream, whereas the historic diversion point was downstream and had contributions from intervening tributaries. Objectors maintained that the transferred water right should be decreased by 7.6% to account for the tributary contributions that would no longer be available to supply the transferred water right.

[¶ 7] The Board held a contested case hearing on April 17–18, 2008, and at its August 18, 2008, meeting voted to grant the petition in part and deny it in part. Specifically, the Board allowed the transfer of water rights attached to 152.5 of the requested 174.8 acres. The reduction consisted of 6.4 acres to account for a four percent (4%) loss

of tributary inflows and 15.9 acres to account for lands VenJohn had historically irrigated with contract reservoir water rather than natural flow water rights. The Board conditioned its approval on the Applicants' submission of amended petition maps, showing, among several changes, the acreage reductions by the Board.

[¶ 8] After receiving the amended maps, the Board issued its written findings of fact, conclusions of law and order. The Board concluded that, with the reductions it made to the requested water right transfer, the petitioned change of place of use "will not allow a quantity of water to be transferred which exceeds the amount historically diverted under existing uses, exceeds the historic rate of diversion, increases the historic amount consumptively used, decreases the historic amount of return flow or in any manner injures other existing lawful appropriators within the meaning of Wyo. Stat. Ann. § 41–3–104." The Board further concluded that the change in point of diversion and means of conveyance for the petitioned water right "will not injuriously affect the rights of other appropriators within the meaning of Wyo. Stat. Ann. § 41–3–114(f)." [2]

[¶ 9] The Objectors petitioned the district court for review of the Board's order, and that court upheld the Board's decision. The Objectors then appealed to this Court.

## STANDARD OF REVIEW

[¶ 10] The Wyoming Administrative Procedure Act governs our review of agency action and provides in pertinent part:

To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or

---

2. Although not raised as a separate issue on appeal, the Objectors assert that the Board's findings of fact and conclusions of law are not sufficiently detailed to comply with the Wyoming Administrative Procedure Act. Wyo. Stat. Ann. § 16–3–110 (LexisNexis 2011) states: "A final decision ... in a contested case shall be in writing.... The final decision shall include findings of fact and conclusions of law separately stated. Findings of fact if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." We agree that the findings of fact in this case are quite general and a more detailed recitation of the facts would have assisted our review of the case under the relevant statutory factors. However, the findings are not so deficient as to prevent us from determining the grounds upon which the Board reached its conclusions. *Compare, Billings v. Wyoming State Bd. of Outfitters and Prof'l Guides*, 837 P.2d 84, 86 (Wyo.1992).

applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

. . . .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011).

[¶ 11] In accordance with § 16–3–114(c), we review the agency's factual determinations by applying the substantial evidence standard, meaning we determine whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). Our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did based upon all of the evidence presented. *Id.* This Court has recognized that the Board of Control has a particular knowledge and expertise in the area of water use and nonuse, and we accord deference to that knowledge and expertise in our review of the Board's factual findings. *Basin Elec. Power Co-op. v. State Bd. of Control*, 578 P.2d 557, 568 (Wyo.1978). We review an agency's conclusions of law *de novo*, and will affirm an agency's legal conclusion only if it is in accordance with the law. *Dale*, ¶ 26, 188 P.3d at 562.

## DISCUSSION

### *Statutory Factors*

[¶ 12] Changes in place of use of water rights are governed by § 41–3–104:

(a) When an owner of a water right wishes to change a water right from its present use to another use, or from the place of use under the existing right to a new place of use, he shall file a petition requesting permission to make such a change. The petition shall set forth all pertinent facts about the existing use and the proposed change in use, or, where a change in place of use is requested, all pertinent information about the existing place of use and the proposed place of use. The board may require that an advertised public hearing or hearings be held at the petitioner's expense. The petitioner shall provide a transcript of the public hearing to the board. *The change in use, or change in place of use, may be allowed, provided that the quantity of water transferred by the granting of the petition shall not exceed the amount of water historically diverted under the existing use, nor exceed the historic rate of diversion under the existing use, nor increase the historic amount consumptively used under the existing use, nor decrease the historic amount of return flow, nor in any manner injure other existing lawful appropriators.* The board of control shall consider all facts it believes pertinent to the transfer which may include the following:

(i) The economic loss to the community and the state if the use from which the right is transferred is discontinued;

(ii) The extent to which such economic loss will be offset by the new use;

(iii) Whether other sources of water are available for the new use.

(emphasis added). A change in place of use obviously also necessitates changes in point of diversion and means of conveyance which are governed by § 41–3–114. Section 41–3–114(f) states that "[n]o petition shall be granted if the right of other appropriators will be injuriously affected."

[¶ 13]   Starting with the first two § 41–3–104 factors, the quantity of water historically used and the historic rate of diversion, the Objectors noted that the diversion rate of the allowed 1 cubic foot per second (cfs) per 70 acres for 174.8 acres would allow diversion of approximately 2.5 cfs.   They then argued that, if Wagonhound diverted at that rate for the entire irrigation season (which they quantified at 153 days), it could divert as much as 750 acre feet of water.   Because the evidence demonstrated that the historical diversion average for the VenJohn property was 422 acre-feet for the eleven preceding years, Wagonhound could potentially divert significantly more water under the transferred right than VenJohn had historically diverted.   The Objectors' expert, Gordon Fassett, opined:

Q.   And what is the potential amount that could be diverted at the new point of diversion if this transfer were allowed?

A.   Well, at maximum, for the full irrigation season from May 1 through September 30, if you do the math of 2.5 cfs each and every day throughout that whole period, it's about 750 acre-foot for the 1–to–70 amount.   And, of course, they would be entitled to surplus of water as well, which could potentially double that.

Q.   Double that to 1,500 acre-feet for an irrigation season?

A.   For the full season.   That would be correct.[3]

■ [¶ 14]   The Objectors' argument depends on the transferred water right being diverted at the maximum rate every single day of the irrigation season.   The argument falters because the diversion of water at the maximum rate every day during a hypothetical 153–day irrigation season is an unlikely, if not impossible, scenario.   Mr. Fassett himself testified that he is not aware of any irrigators in the county that divert at their full rate of diversion every day of the irrigation season.

[¶ 15]   Dustin Ewing, Wagonhound's business manager, testified regarding the Objec-tors' concern that Wagonhound would divert water at the maximum rate:

Q.   Is it the intent of Wagonhound to use those water rights to irrigate any more acres than Mr. VenJohn is irrigating?

A.   No.

Q.   Is it the intent of Wagonhound to divert water from the river at any greater rate than Mr. VenJohn is?

A.   I see no reason for it.

Q.   Do you know of any reason why Wagonhound would use a greater quantity of water for irrigation than Mr. VenJohn is using?

A.   No, . . . they're the exact same pivots.   In fact, it's our goal to bring up the same pivots used at the VenJohn to use on the Wagonhound property.

[¶ 16]   Doyl Fritz, Applicants' expert who reviewed the historic operations at both the VenJohn and Wagonhound properties, testified there would be no reason for such an increase in diversion:

I'm looking at [Wagonhound's] system out there, and they've got a good system. They operate it very well, and they show what those historic diversions are.   While they could pump more water just because they could, it doesn't make sense.   It costs money, doesn't increase crop yields, and there would be no reason to do that.

[¶ 17]   In determining the amount of Ven-John's historical use available to transfer to Wagonhound, the Board relied upon evidence of the amount of acreage historically irrigated and the statutory diversion rate of 1 cfs per 70 acres.   *See generally,* Wyo. Stat. Ann. § 41–4–317 (LexisNexis 2011).   The evidence included the pump diversion records, the State's five year base maps showing actual irrigated acreage from 2002 through 2006, aerial infrared photographs showing evidence of irrigation on VenJohn's land, VenJohn property water usage records for 2007, and testimony by Mr. VenJohn and Greg Richen-difer, Wagonhound's farm manager, confirming irrigation activities from 1998 through 2007 on the VenJohn property.

---

**3.**  The reference to the "double" appropriation is to surplus water rights allowed under Wyoming statutes when the natural flow of the stream exceeds the existing appropriations.   Wyo. Stat. Ann.  §§ 41–4–317  through  324  (LexisNexis 2011).

[¶ 18] Mr. VenJohn stated he grew crops on his land each year, including typical harvests of over 5 tons of alfalfa per acre. He testified that he flood irrigated "150–plus acres" of his property from the time he purchased it in 1998 until he installed pivot sprinklers in 2003. After the sprinklers were installed, he irrigated the full 174.8 acres each year from 2003 through 2006. Mr. VenJohn used his water rights each year from the end of April until late August or September, applying the appropriate amount of water to fit the crops' needs, including the double appropriation when it was available. Mr. Richendifer oversaw the irrigation of the VenJohn property in 2007 and testified that the entire acreage was irrigated.[4]

[¶ 19] Mr. Fritz testified that the actual amounts diverted under any water right in different seasons will vary depending on amounts of precipitation, other climate conditions, crop choice and application methods. In fact, the evidence showed that, over a ten year period from 1997 through 2007, VenJohn diverted significantly different amounts of water, ranging from a low of 178 acre feet in 1998 to a high of 717 acre feet in 2006. Even though the diverted amounts changed from year to year, the water was still applied to the acreage annually.

[¶ 20] The Board's decision to consider the historical use question from the standpoint of acreage historically irrigated, rather than a total volume of water which could be diverted if exercised at the maximum amount for the entire irrigation season, is consistent with the concept of the "duty of water" which was discussed in *Basin Electric*, 578 P.2d 557. The duty of water is described generally as

"that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions."

*Id.* at 564, quoting *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629, 634–35 (1954).

[¶ 21] Using the actual amount of acres irrigated as the means of measuring historic use, the Board reduced the transferred amount by 15.9 acres to account for acreage not historically irrigated by VenJohn using its natural flow rights. The evidence established that, in all but one year, the 15.9 acres had been irrigated with contract reservoir water. The Board's denial of a transfer of those acres, together with the 6.4 acre reduction for loss of tributary inflows (discussed *infra*), resulted in a reduction of the allowed diversion rate from 2.5 cfs to 2.18 cfs (152.5 acres divided by 70 to account for the 1 cfs per 70 acre statutory diversion rate). Deferring to the Board's expertise in matters of water use and non-use, we see no error in its decision to use actual acreage irrigated rather than the average amount of water diverted as the means for determining VenJohn's historic use. Thus, the evidence of VenJohn's historic use of its water right and Wagonhound's typical irrigation procedures provided substantial evidence in support of the Board's decision that, as reduced, the transferred water right will not "exceed the amount of water historically diverted under the existing use, nor exceed the historic rate of diversion under the existing use." Section 41–3–104.

[¶ 22] The third factor identified in § 41–3–104 is consumptive use. Under the statute, the transfer shall not "increase the historic amount consumptively used under the existing use." *Id.* In *Basin Electric*, 578

4. The Objectors assert that prior to 2007 VenJohn was only legally entitled to irrigate 148.7 of the 174.8 acres, and the Applicants could not, therefore, establish historical irrigation of the 26.1 acres that were not properly included in VenJohn's appropriation. This assertion is based upon the Board's approval in 2007 of VenJohn's 2006 petition to change the place of use to recognize the area actually irrigated by pivots installed in 2003. The Board took administrative notice of the 2006 proceeding in the present action. The Objectors' argument regarding this matter seems to be, in part, a collateral attack on that earlier proceeding; however, they do not explain the legal basis for such an attack. Therefore, we will not further address it. Ultimately, the Applicants established that the entire 174.8 acres had been irrigated since 2003 and the Board had authorized that use through its approval of VenJohn's 2006 petition.

P.2d at 567, we recognized that "the concept of consumptive use has been consistently limited to the amount of water, less other contributing sources of water, which will result in the successful growing of a crop." The proposed change in place of use would take water used for irrigation of crops under pivot sprinklers at the VenJohn property and transfer it to irrigation of crops under pivot sprinklers at the Wagonhound property. Mr. Fritz investigated the consumptive uses at both the VenJohn and Wagonhound locations and concluded that consumptive use at both properties was the same for crop irrigation, noting similarities in latitude, elevation, crops, application methods, and soil types.

[¶ 23] The Objectors do not dispute this, but instead argue that Wagonhound has a complex irrigation system that will allow it to divert continuously at the maximum rate "with no effort being made to ensure that the VenJohn water is actually applied to the land to which it is attached."

In other words, Wagonhound does not care whether the "VenJohn" water is applied to the lands they have identified as receiving that water. Wagonhound will instead apply that water to any one of the fields that are fed with the sprawling center pivots that make up the [Wagonhound property].

[¶ 24] The evidence does not support the Objectors' argument. Greg Richendifer, Wagonhound's farm manager, testified:

Q. Ms. Hageman asked you to help her calculate the amount of water that could be pumped through the VenJohn sprinklers if they're moved to the [Wagonhound property]—

A. Uh—huh.

Q. —and if operated for the entire irrigation season. And I believe you and she came up with a number of approximately 750 acre-feet that could be pumped through those sprinklers at the [Wagonhound property]; is that right?

A. Yes.

Q. Would that be the same amount that could be pumped through those sprinklers at the VenJohn property?

A. Yes.

Q. Would it be your plan to pump through those sprinklers every single day season-round without a break?

A. No. You have to stop to harvest, dry up the soil.

Q. Would it be your plan to use those sprinklers consistent with the way you use sprinklers that are currently on the [Wagonhound property]?

A. It would be managed exactly the same way.

Q. Now, you were asked a little bit about controlling the flow and quantity of water through the pivot system. If you have one pivot circuit that has a right that's in priority and one that has a right that's not in priority—in other words, that water's not available for you—can you control whether the water goes to the one that's in priority or the one that's not in priority?

A. Yes, we can.

Q. If you needed to decrease the flow of water to these pivots, can you do that with your system?

A. Yes, we can.

Q. If you needed to control the total quantity of water that goes to a particular area of land under a pivot, do you have the capability of doing that?

A. Yes, we do.

[¶ 25] The Objectors' argument that Wagonhound will improperly apply the transferred water is speculative and suggests that the water use authorities would allow misuse of water resources. We decline to accept their premise. Considering the type of land, climate and other on-the-ground factors, the evidence supports the Board's conclusion that the transfer will not result in any greater consumption of water by Wagonhound than VenJohn's operations did.

[¶ 26] The next § 41-3-104 factor requires that the transfer not decrease the historic amount of return flow. Return flow is related to the concept of consumptive use because the water that is not consumed returns to the river. The Objectors contend the transfer of the VenJohn water right may reduce the return flows to the river because Wagonhound diverts water into lined ponds,

whereas VenJohn did not use lined ponds. They allege that the possible reduction in return flows may in turn decrease the amount of natural flow at the Orin gauge, which may in turn increase the chances that Objectors' water rights could be subjected to regulation.

[¶ 27] The Objectors' allegations regarding the loss of return flow are not supported by the record. VenJohn and Richendifer both testified that, while the VenJohn irrigation system was not as complex as the Wagonhound system, it was an efficient system that allowed very little runoff or return flow. Thus, the evidence showed there was very little return flow under either the VenJohn or Wagonhound operation. The Board's determinations that the transfer would not result in greater consumptive use or decrease the return flows are supported by relevant evidence which a reasonable mind might accept in support of its conclusions.

[¶ 28] Finally, § 41–3–104 states that a change in place of use will not be allowed if it would in any manner injure other existing lawful appropriators and § 41–3–114 states that a change of point of diversion and means of conveyance shall not be granted "if the right of other appropriators will be injuriously affected." The Objectors argue that they will be injured by a transfer of VenJohn's water rights to Wagonhound because:

> [a]ny increase in diversions, any increase in water use, any increase in consumptive use, and any decrease in return flows will ricochet through the system, potentially resulting in negative natural flow, administration of the cumulative irrigation diversions in the area upstream of Guernsey, the declaration of an allocation year, and the regulation of the [Objectors].

[¶ 29] On the question of injury to other appropriators, the Board noted the testimony of Applicants' expert Doyl Fritz:

> [Applicants'] witness Doyl Fritz, a civil engineer with Western Water Consultants and extensive experience in petitions for change of use and place of use, outlined his investigation of the changes proposed in the Petition, and gave his assessment of its potential effects. Mr. Fritz testified that

the proposed changes would not increase the likelihood of "regulation" (that is, situations where junior appropriators are required by the State Engineer's Office to temporarily discontinue their use in order to protect the rights of senior appropriators in times of water scarcity). At the conclusion of his direct testimony, Mr. Fritz gave his opinion that the proposed changes would not result in changes in the flows of the North Platte River that would be measurable or even noticeable by anyone.

[¶ 30] The Objectors' assertion that they would be injured by the transfer depends upon findings in their favor on the other § 41–3–104 factors. Given our conclusion that substantial evidence supports the Board's determination that the petition meets the other requirements of the statute and the specific evidence that the proposed changes would not result in any measurable changes in the North Platte River flow, we also conclude the record contains substantial evidence to support the Board's conclusion that the Objectors will not be injured by the transfer.

### *Tributary Inflows*

[¶ 31] The Board made a 4% reduction in the transferred water right to account for contributions from the two main tributaries above the historic diversion point, Wagonhound and LaBonte creeks, that will not be available to supply the transferred water right at the new point of diversion. The Board made the following findings in support of its reduction:

> 28. THAT upon his consideration of the USGS data, Mr. Fassett estimated that 7.6% of the annual historic flow available from the North Platte River at Petitioner VenJohn's record diversion point, located near the North Platte River at Orin g[u]age, is contributed by LaBonte and Wagonhound Creeks.
>
> 29. THAT the [Applicants]' consulting expert, Mr. Doyl Fritz, reviewed available data pertaining to relevant flows and testified that it is difficult to make an estimate of the percentage contribution of Wagon-

hound and LaBonte Creeks, since the g[u]aging history for both ends in 1969, and there is not a lot of coincident period of record. He testified that the data and records do show that, for both creeks in August and September, there were periods of "zero flow." He also testified that using an average, as opposed to a median, flow rate is not a valid method of comparison. It was his view that determining the normal tributary inflows from Wagonhound and LaBonte Creeks (by "averaging" their flows for an entire year) is statistically misleading. Mr. Fritz offered his opinion that the use of "median or some other measure" would be a more applicable method (to determine tributary contributions). He testified that, "You can have nine years of zero flow and one year of 10,000 and your average would be 1,000 acre-feet per year but in nine years you have nothing."

30. THAT Mr. Fassett acknowledged that there is a difference between "average" and "median" flows on cross-examination, but indicated that he preferred to use "long-term averages" to "avoid any single-year bias."

31. THAT [Objectors'] Exhibit 36 averages the tributary inflows for Wagonhound Creek and LaBonte Creek by day for selective years. [Objectors'] Exhibit 114 uses the daily average derived from [Objectors'] Exhibit 36 to produce a calculated average monthly flow rate for Wagonhound Creek and LaBonte Creek. [Objectors'] Exhibit 114 compares the long-term monthly averages derived from selective years included in these tributary data to the average monthly natural flows of the North Platte River between 1997 and 2007. None of the years, 1997 through 2007, included within these tributary data in [Objectors'] Exhibit 114 are included within the USGS data.

32. THAT having considered the competing evidence and views expressed by the parties' expert witnesses, its own files relating to this matter, and drawing upon its practical experience with similar petitions for change of use and/or place of use with associated change of point of diversion, the Board determined that a 4% trib-

utary inflow from LaBonte and Wagonhound Creeks to the North Platte River is a reasonable estimate of the supply contributed by the principal intervening tributaries during the irrigation season for use at the existing point of diversion, which is downstream of these two (2) previously-g[u]agued creeks. The new points of diversion will be above both creeks. Accordingly, the Board determined that, if it decided to approve the change of point of diversion, it should assess a reduction of 6.4 irrigated acres (that is, the 174.8 acres sought less the 15.9 acres discussed in Findings of Fact Nos. 33 and 34, below, for a total of 158.9 acres multiplied by a factor of 4%). The Board considers a 4% reduction in acres, to account for tributary inflow, a reasonable estimate of the supply which will not be available at the new point of diversion as a result of moving the point of diversion upstream of those tributaries, as requested by [Applicants].

[¶ 32] The Objectors had requested a 7.6% reduction in accordance with Mr. Fassett's testimony and on appeal challenge the Board's 4% reduction. However, Mr. Fassett acknowledged that the 7.6% figure was an estimate based on average tributary contributions that are higher early in the irrigation season and "very modest" late in the season. Additionally, the years from which the data was extracted for that average were selected years before 1969.

[¶ 33] The Applicants, on the other hand, presented evidence that measurements of the flow of the North Platte River above and below the tributaries indicate they did not contribute in any material fashion to the total flow of the river. There was also evidence presented at the hearing indicating that the flow of Wagonhound Creek during the preceding five years was insufficient to fulfill even the permitted appropriations on the creek. Given the conflicting evidence and the difficulty in calculating the tributary contributions with any degree of precision, the Board's decision to rely on its own expertise and apply a 4% reduction to account for the tributary inflows was appropriate. *See generally, Basin Electric,* 578 P.2d at 568.

### Defects in Petition to Change Point of Diversion

[¶ 34] The Objectors contend the Applicants' petition to change the point of diversion was defective because it did not fully identify ownership of the appropriation or state whether VenJohn was the sole owner of the facilities involved or had obtained the consent of other owners, as required by § 41-3-114. Specifically, the petition did not identify the ownership interests of Michael Long, David Sea, and Christopher Cox. Nevertheless, the three landowners did have notice of the proceeding and Mr. Long and Mr. Cox both appeared and testified at the hearing.

[¶ 35] The Board acknowledged the defects in the petition and directed the Applicants to correct the petition and submit amended petition maps to reflect the ownership interests of the omitted landowners. The Applicants submitted the amended petition maps prior to entry of the Board's order.

[¶ 36] Although the Objectors claim the defects in the original petition require reversal of the Board's decision, they do not sufficiently explain why the amendment process was inappropriate or how it violated statute or board rules. They also do not demonstrate how the other landowners were injured by the petition or the process employed by the Board. Without further explanation, we cannot accept the Objectors' argument.

[¶ 37] Affirmed.