205 P.3d 1024 (2009)
2009 WY 57
In the Matter of the Worker's Compensation Claim For Benefits For Howard W. WILLIAMS, Deceased Employee of Capitol City Maintenance, Inc.
Sharon Williams, Appellant (Petitioner),
v.
State of Wyoming ex rel. Wyoming Workers' Safety and Compensation Division, Appellee (Respondent).
No. S-08-0034.
Supreme Court of Wyoming.
April 21, 2009.
*1025 Representing Appellant: Donald J. Sullivan of Sullivan Law Offices, P.C., Cheyenne, Wyoming.
Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; J.C. Demers, Special Assistant Attorney General. Argument by Mr. Causey.
Representing Amicus Curiae Watchtower Bible and Tract Society of New York, Inc.: *1026 Paul D. Polidoro and Keturah A. Dunne, Associate General Counsel, Patterson, New York; Diana Sampson Rhodes of Rhodes Law Firm, LLC, Cheyenne, Wyoming.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.
GOLDEN, Justice.
[¶ 1] Appellant, Sharon Williams, sought worker's compensation death benefits as the surviving spouse of Howard W. Williams, who died from injuries suffered in a work-related car accident. Appellee, the Wyoming Workers' Safety and Compensation Division (Division), denied Mrs. Williams' claim for death benefits on the basis that Mr. Williams refused reasonable and necessary medical treatment. On appeal, the Office of Administrative Hearings hearing examiner also denied benefits. The hearing examiner determined that, pursuant to Wyo. Stat. Ann. § 27-14-407, Mr. Williams had forfeited all right to benefits under the Wyoming Worker's Compensation Act when he refused to allow the use of blood products to treat his injuries. Mrs. Williams petitioned for review by the district court, and the matter was certified to this Court. On the specific facts and evidence in this case, we reverse and remand with directions that the applicable death benefits be awarded to Mrs. Williams.

ISSUES
[¶ 2] Mrs. Williams raises the following issues:
I. Whether the State may constitutionally refuse Worker's Compensation benefits where an injured worker, on the basis of sincere religious grounds, declines to accept human blood products from another person, without thereby violating his constitutionally-protected religious liberties?
II. Whether the forfeiture-of-benefits statute even applies to a situation that does not involve knowing and persistent misconduct which affirmatively harms the medical situation, but rather where the worker merely makes an election among various available methods of medical care?
III. Whether the Division, which without dispute has the burden of proof in urging forfeiture, may prevail where it produces no evidence to satisfy any of the several distinct conditions of the forfeiture statute?
IV. Whether the forfeiture statute can be extended to include the new scope the Division seeks to adopt?
In response, the Division presents these issues:
I. Is the hearing examiner's finding regarding Employee's forfeiture of benefits under Wyo. Stat. Ann. § 27-14-407 supported by substantial evidence?
II. Are the constitutional issues raised in the Brief of Appellant properly before this Court?

FACTS
[¶ 3] On February 9, 2006, Mr. Williams, a maintenance technician for Capital City Maintenance, Inc. (CCM), was riding in an automobile on the interstate to a job site in Laramie, Wyoming. The driver of the vehicle, Mrs. Williams, lost control, the vehicle rolled several times, and Mr. Williams was severely injured.[1] He was subsequently transported by ambulance to United Medical Center (UMC) in Cheyenne. Mrs. Williams was also injured in the accident and transported by ambulance to UMC. The record indicates that her injuries were less severe than Mr. Williams and she was alert and able to converse with medical personnel.
[¶ 4] According to Dr. M. Whitney Parnell, the treating physician, Mr. Williams was "pretty banged up." Mr. Williams showed signs of external trauma to his left side, he had tenderness over that area and his lower ribs, and he was hypotensive, meaning his blood pressure was "fairly low." Dr. Parnell suspected that Mr. Williams had a splenic injury and was bleeding internally. In her *1027 Consultation Report, Dr. Parnell described her initial impression:
This is a 67-year-old gentleman who was involved in a severe motor vehicle accident in which he was the passenger who was thrown from the front seat of the vehicle to the back. The patient has obviously suffered a significant splenic injury with splenic rupture and free intraabdominal bleeding.
[¶ 5] Mr. and Mrs. Williams indicated to Dr. Parnell that they were Jehovah's Witnesses and, as such, they did not want any blood products used in the treatment of Mr. Williams. Dr. Parnell inquired if other substances with similar properties, such as albumin, were allowed. Mrs. Williams was unsure, and asked Dr. Parnell not to administer any albumin until her son arrived at the hospital. Dr. Parnell also inquired about the use of Cell Saver, which is an individual's own blood cleansed.[2] Mr. Williams was uncertain if the use of Cell Saver was appropriate and asked Dr. Parnell to wait until his son arrived.
[¶ 6] While awaiting the son's arrival, Dr. Parnell gave Mr. Williams non-blood fluid resuscitation products and obtained a chest x-ray and computed tomography (CT) scans. Dr. Parnell's Consultation Report explained her treatment during this period of time and what the chest x-ray and CT scans revealed:
Initially a STAT portable chest x-ray had been obtained and I thought it was without evidence of pneumothorax. It did have a slight haze on the left side of the chest. The film did appear slightly under-penetrated. There was no obvious mediastinal widening and the diaphragm appeared to be in normal position.
At this point I continued saline resuscitation and elected to give him 500 cc of Hespan resuscitation also. The patient continued to be hypotensive, blood pressures anywhere from 79-100. At this point when the blood pressure got up to 100, I asked that we get infusion of dopamine and bring this to the CT scan room for resuscitative measures if needed. Computed tomography scan examinations revealed the following: ...
1. Computed tomography scan of the head was without evidence of acute trauma.
2. Computed tomography scan of the cervical spine was without evidence of acute trauma.
3. Computed tomography scan of the chest was without evidence of acute trauma.
4. Computed tomography scan of the abdomen and pelvis showed evidence of a diffuse hemoperitoneum with obvious splenic rupture and free fluid throughout the abdomen. There was a questionable haziness around the bladder suggestive of possible rupture. The only other injury found was a slight fracture of the vertebral body to T4.
[¶ 7] Mr. Williams' son subsequently arrived at the hospital and consented to the Cell Saver procedure. Based on the information garnered from the CT scans, Dr. Parnell decided to perform an emergency splenectomy. Dr. Parnell informed Mr. Williams' son that "the decision not to allow any blood products, including whole blood, packed red blood cells, plasma, and/or platelets, cryoprecipitate, etc, may indeed make it very difficult to resuscitate and manage [Mr. Williams]." The son indicated he understood the situation, and the surgery was performed without the use of any foreign blood products.
[¶ 8] According to Dr. Parnell's Operative Report, Mr. Williams had "massive intraabdominal" bleeding, his spleen was in two pieces, and he had lost five liters of blood. Dr. Parnell removed Mr. Williams' spleen and retransfused two liters of Mr. Williams' blood into him using the Cell Saver. The Operative Report indicates that Dr. Parnell also evaluated the rest of Mr. Williams' abdominal cavity and pelvic area during the surgery and found no signs of trauma.
[¶ 9] After the surgery, Mr. Williams was taken to the intensive care unit, where his *1028 condition deteriorated. Despite aggressive fluid resuscitation efforts, Mr. Williams remained hypotensive and his blood pressure continued to drop. According to the Consultation Report of Dr. Laura Brausch, who provided a consultation at the request of Dr. Parnell, Mr. Williams' blood pressure was "65/34" and was dropping "into the 30s and 40s." Dr. Brausch described her impression as follows:
This is a 67-year-old male status post motor vehicle accident who sustained a severe splenic injury and very significant blood loss. This severe hemorrhage, we are not able to replace with blood products and replacing at this point with saline, albumin and even hetastarch is not helping this patient. We have him on high doses of both Norepinephrine and Dopamine in addition to rapid infusion of IV fluids without benefit. He has received calcium times two and bicarbonate times three. We are all afraid that the patient is dying and we have used the resources we are allowed to use to their fullest extent.
Mr. Williams died at 6:36 p.m., after his heart stopped from lack of blood pressure. According to Dr. Parnell, Mr. Williams essentially bled to death.
[¶ 10] Mrs. Williams filed a claim for death benefits and funeral expenses. On March 24, 2006, the Division denied her claim for the reason that the "medical documentation submitted to the Division indicates the cause of death was due to the refusal of reasonable and necessary medical care." Mrs. Williams objected to the denial and requested a hearing. The Division thereafter filed a petition for forfeiture of benefits pursuant to Wyo. Stat. Ann. § 27-14-407 (LexisNexis 2007), which provides:
If an injured employee knowingly engages or persists in an unsanitary or injurious practice which tends to imperil or retard his recovery, or if he refuses to submit to medical or surgical treatment reasonably essential to promote his recovery, he forfeits all right to compensation under this act. Forfeiture shall be determined by the hearing examiner upon application by the division or employer.
[¶ 11] At the contested case hearing held on November 20, 2006, the hearing examiner was presented with numerous medical records, the affidavit and testimony of Howard Williams, CCM's president, and the deposition testimony of Dr. Parnell. Of relevant importance to the hearing examiner's decision is the following testimony provided by Dr. Parnell:
Q. Can you give us your best sense, knowing everything that you know, at the point that you first evaluated [Mr. Williams] and with the benefit of hindsight, how good or not good were his chances of survival?
A. In general, I think he had potentially survivable injuries, but not guaranteed.
Q. Okay. And one of the striking features of this patient's case is the refusal of human blood products. Can you give us your sense, Doctor, of the difference, if any, that his decision not to accept human blood productsdid that change his outcome?
A. I don'tI can't say that it changed his outcome. I can say it changed my management.
Q. What do you mean by that?
A. I would have taken him to the operating room sooner because I wouldn't have had to wait for the son. And actually, Mr. Williams was requesting that I wait for the son before going; and also, I felt his best chance of survival was to use the Cell Saver. Had he declined use of the Cell Saver, I think he would have died in the operating room.
And that was my sense prior to starting it is that if we had no ability to give him back even his own blood, then he probably would have expired in the operating room.
The management was justit was like a fork in the road; and I went down a different road because of his religious beliefs, which is absolutely within his power to do so. Whether or not he would have survived with or without blood products, I don't know that I can say.
I can say that it changed my management but that he had significant injuries. He had ahe had an obvious significant injury to his spleen, his back. I presume if *1029 he had time, we probably could have found ribs and pulmonary issues. And these are enough in a 67-year-old gentleman to have themthey could be fatal. This constellation of problems can be fatal, despite our best efforts.
Q. And is thereis there any way that you or another good surgeon can say with any level of certainty that had this patient accepted human blood that he would have survived and lived to leave the hospital?
A. I don't know that anyone could say that with certainty.
* * * *
Q. If he had allowedif there had been no issue in terms of providing the transfusion, what would have been done differently?
A. He would have gone to surgery sooner; and I probably would have transfused, in addition to his own blood, other blood products, not just red blood cells but clotting factors. And that's probably would have assisted in his management.
Q. And when you say "clotting factors," that would haveyou would have been doing two things, then; one is replacing the lost blood and the other is also slowing the bleeding?
A. It's really not slowing the bleeding, it's assisting with the clotting... so that I'm replacing not only the lost blood with blood components, the platelets and clotting factors that assist with clotting throughout the whole body.
Q. Okay. And how is that helpful assisting with the clotting?
A. Well, when you bleed, you don't just bleed red blood cells, you bleedin our society today we don't transfuse whole blood, except for in the military. But when you bleed, you bleed whole blood; so we fractionate it into a variety of product, red blood cells, platelets, white cells, fresh frozen plasma.
There's a variety of factors, even down to specific clotting factors to, say, a hemophiliac is in need of. And those clotting factors are important just as actually transfusing the red blood cells.
In general, when you give the Cell Saver blood back, that's really all you're getting back. It cleanses a lot of stuff out, but I don't know how much of the clotting factors it cleanses out.
Q. So clotting factors are important to survival?
A. Yes.
* * * *
Q. Okay. In this case there was a splenic injury and apparently a splenic laceration and significant bleeding, correct?
A. Yes.
Q. Typically are splenic injuries fatal?
A. Can be. I had a patient die this year, so Mr. Williams is not the only one.
Q. What percentage of splenic ruptures survive?
A. I don't know.
Q. Is there a high percentage of them that survive?
A. I think that that would be a difficult question to answer; because if you have an isolated splenic injury, that's different than if you have constellation of injuries that in total.
In general, what we do when you're looking at survivability is you look at an injury severity score, and that takes into account not just the main injury but also other complicating factors. And an isolated splenic injury in an 18-year-old is a lothas a higher probability of survival than an isolated splenic injury in a 57(sic)-year-old.
So it's not ... apples to apples.
* * * *
Q. Okay. In this case, if you'd been able to use whatever blood products you wanted to, would it have increased the likelihood of survival?
A. I think it would have increased the likelihood of survival. I could not have guaranteed survival.
* * * *
Q. The failure to use blood products or the allowance to use whatever blood products you wanted to imperiled recovery?
* * * *

*1030 A. I've said it affected my management, you know; but it's difficult to say and I've said this againthat it changed management of this patient.
My inability to use blood products in management of this patient, whether it be before surgery, during surgery or afterit affected my management throughout the duration.
But I can't sayI can't say for certain had I used them postoperatively that he would have survived, even if the family would have changed their mind. I don't know that he would have survived.
Q. Well, let me ask you this: It changed your management, you would have used a different protocol; and just so I'm clear, that's notwhen you say it changed your management, it doesn't just mean that it might have made it more difficult to you or changed what you did, it changed your management in the sense that you didn't utilize what you would have otherwise considered optimal in terms of promoting recovery, correct?
A. I would have changed the timing of surgery. I probably would not have gotten all the CT scans, but I had time to do so because we were waiting on the son. And I would have taken him probably more directly to surgery, and I probably would have continued to use blood products throughout his course, whatever laboratory backup, you know, would have given me as to, you know, if the clotting factors are off or if platelet counts are low. I would have transfused those units.
But it was, like I said, a fork in the road. I went down a different fork, managed it the way that the patient requested, which is absolutely within his right.
Q. I understand that you went down a less optimal fork.
A. I don't know that it's less optimal, because it isit is absolutely within his right to make these decisions and
Q. I understand, Doctor. And we're getting tied up in philosophical issues. I just want it to be physiological.
A. I'm just saying it's not the way that a non-Jehovah's Witness patient is managed. I would not havethe reason I managed the patient this way is because he requested that.
* * * *
Q. Okay. A delay in surgery in a case like this reduces the likelihood of recovery, correct?
A. By "recovery," you mean survival?
Q. Survival.
A. I think any delays in the field, delays to the operating room, delay to surgeryI think that it obviously affects survival.
Q. Reduces the likelihood?
A. Yes.
Q. Okay. And the inability to transfuse, to use blood products, reduced the likelihood of survival in this case, correct?
A. I think that that would have benefitted him, yes. Using blood products would have benefitted him.
Q. Okay. So it reduced the likelihood of survival?
A. Yes.
* * * *
Q. ... by how much?
A. I don't know that I could ever quantify that, and I've said that before.
I think that I could not have guaranteed survival with an elderly gentlemen like this with the fairly long transport time that he had, because I think he was out on I-80, if I remember correctly. It was kind of a long period of time.
He presented hypotensive. He had already bled quite a bit. I don't know that this entire process would have been reversible; but I agree with your statement that his odds of survival would have improved had I had all the arrows in my quiver, but I didn't.
[¶ 12] In his Findings of Fact, Conclusions of Law and Order rendered on December 20, 2006, the hearing examiner reversed the Division's denial of Mrs. Williams' claim for benefits.[3] The hearing examiner found:

*1031 36. Mrs. Williams has proved that Mr. Williams suffered an "injury" as it is defined in Wyo. Stat. Ann. § 27-14-102(a)(xi) (Lexis[Nexis] 2005). Furthermore, Mrs. Williams has proved that there is a causal connection between Mr. Williams' injuries and his employment. According to the undisputed affidavit of Mr. Williams' son, who was also Mr. Williams' employer, Mr. Williams was traveling for his employment as a maintenance technician and was being reimbursed for his travel expenses when the motor vehicle accident occurred. The medical reports indicate Mr. Williams' injuries were caused by the motor vehicle accident.
37. The Division's Final Determination denying benefits because Mr. Williams' "cause of death was due to refusal of reasonable and necessary medical care" is not supported by the evidence. Dr. Parnell testified in her deposition she could not guarantee Mr. Williams would have survived if she had been able to use blood products and if she could have gotten him to surgery sooner. The evidence demonstrates Mr. Williams' spleen was lacerated during his work-related car accident and his lacerated spleen was the cause of his massive blood loss and subsequent death.
[¶ 13] The hearing examiner, however, ultimately determined Mrs. Williams was not entitled to benefits, agreeing with the Division that Mr. Williams had forfeited all right to worker's compensation benefits by refusing to allow the use of foreign blood products to treat his splenic injury:
39. The Division has proved, by a preponderance of the evidence, that Mr. Williams "refused to submit to medical or surgical treatment reasonably essential to promote his recovery." The medical reports indicate that Mr. Williams was alert enough to converse with Dr. Parnell when he came into the emergency room. The reports are undisputed that Mr. Williams told Dr. Parnell that he did not want any blood products and that Dr. Parnell should wait until his son arrived before using the Cell Saver.... Therefore, Mr. Williams clearly "refused to submit to medical or surgical treatment." Although Dr. Parnell never stated or noted that the use of blood products were "reasonably essential to promote [Mr. Williams'] recovery," Dr. Parnell's deposition testimony and consultation report disclose the essential nature of blood products in treating Mr. William's [sic] injury. In her Consultation Report, Dr. Parnell reveals the importance of the use of blood products when she described her conversation with Williams' son: "I spoke quite frankly that the decision not to allow any blood products including whole blood, packed red blood cells, plasma, and/or platelets, cryoprecipitate, etc, may indeed make it very difficult to resuscitate and manage the patient." ... In addition, Dr. Parnell stated in her deposition testimony, she would have used blood products if she had been permitted, the use of blood products would have benefited and assisted Mr. Williams and it would have increased Mr. Williams' likelihood for survival. Dr. Parnell put it quite succinctly when she stated, "I agree with your statement that his odds of survival would have improved had I had all the arrows in my quiver." The importance of treating Mr. Williams' injury with blood products is also demonstrated by Dr. Brausch's Consultation Report which states, "[w]e are all afraid that the patient is dying and we have used the resources we are allowed to use to their fullest extent."
40. Although this case falls more squarely within the second prong of Wyo. Stat. [Ann.] § 27-14-407 (Lexis[Nexis] 2005)a refusal to submit to reasonably essential medical or surgical treatment the facts also support a conclusion that Mr. Williams knowingly engaged in an injurious practice which tended to imperil or retard his recovery, the first prong of the statute. The Wyoming Supreme Court stated, "[t]he unambiguous language of § 27-14-407 requires that a showing be made that an employee has engaged in some action or activity which `tends' to impact his recovery." [Celotex Corp. v.] Andren, 917 P.2d [178,] 181 [(Wyo. 1996)]. Mr. Williams' knowing refusal to allow blood products was an "action" which tended to impact his recovery. According to Dr. Parnell, that action decreased his *1032 chances for survival. A refusal or failure to take action may amount to an injurious practice. Hanberg [v. World Wide Construction], 741 P.2d [107,] 108 [(Wyo. 1987)] (failure to report to court-ordered alcohol rehab was an injurious practice).
41. Mr. Williams forfeited all right to compensation under the Worker's Compensation Act because his refusal to allow the use of blood products to treat his lacerated spleen was, (1) an injurious practice tending to impact his recovery, and (2) a refusal to submit to medical or surgical treatment reasonably essential to promote his recovery.
[¶ 14] Mrs. Williams disagreed with the hearing examiner's decision and sought review by the district court. The district court certified the matter to this Court, which we accepted pursuant to W.R.A.P. 12.09(b).

STANDARD OF REVIEW
[¶ 15] The scope of our review of administrative agency decisions is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2007), which provides in pertinent part:
(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
* * * *
(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
[¶ 16] We recently set forth the proper application of these standards in Dale v. S & S Builders, LLC, 2008 WY 84, ¶¶ 20-26, 188 P.3d 554, 560-62 (Wyo.2008). In short, if the agency's finding favors the burdened party, as in this case, we must determine if substantial evidence exists to support that finding by "considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions." Id., ¶ 22, 188 P.3d at 561. We review an agency's conclusions of law de novo, and will affirm only if they are in accordance with the law. Id., ¶ 26, 188 P.3d at 561-62.

DISCUSSION

Constitutionality of § 27-14-407
[¶ 17] Mrs. Williams' first argument challenges the constitutionality of § 27-14-407. She claims the statute, as applied to Mr. Williams' refusal to accept blood products, violated his constitutionally protected right to the free exercise of religion.[4] Mrs. Williams raised the same constitutional issue before the hearing examiner. The hearing examiner correctly concluded that administrative agencies do not have the authority to determine the constitutionality of a statute.
[¶ 18] Procedurally, Mrs. Williams is barred from raising this constitutional claim in the context of this case. The law is clear that administrative agencies have no authority to determine the constitutionality of a statute and that neither the district court nor this Court has jurisdiction on appeal of agency action to consider the issue. Escarcega v. State ex rel. Wyoming Dep't of Transportation, 2007 WY 38, ¶ 22, 153 P.3d 264, 270 (Wyo.2007); Torres v. State ex rel., *1033 Wyoming Workers' Safety & Comp. Div., 2004 WY 92, ¶¶ 6-8, 95 P.3d 794, 795-96 (Wyo.2004); Billings v. Wyoming Bd. of Outfitters & Guides, 2001 WY 81, ¶ 41, 30 P.3d 557, 572 (Wyo.2001); Dorr v. Wyoming Bd. of Certified Public Accountants, 2001 WY 37, ¶ 13, 21 P.3d 735, 742 (Wyo.2001); Shryack v. Carr Constr. Co., Inc., 3 P.3d 850, 856 (Wyo. 2000); Riedel v. Anderson, 972 P.2d 586, 586-88 (Wyo.1999). This prohibition exists regardless of whether the question concerns "the constitutionality of the statute per se or the constitutionality of the statute as applied." Escarcega, ¶ 22, 153 P.3d at 270 (quoting Riedel, 972 P.2d at 587). The proper avenue for challenging the constitutionality of a statute is an independent action for declaratory judgment pursuant to W.R.A.P. 12.12. Id.; Torres, ¶ 8, 95 P.3d at 796; Riedel, 972 P.2d at 587. Because the issue is not properly before us, we will not address Mrs. Williams' argument.

Substantial evidence
[¶ 19] The parties present many interesting questions but our resolution of the instant case requires analysis of only one question. The decisive question in the instant case is whether the hearing examiner's determination that Mr. Williams' decisions ran afoul of § 27-14-407 is supported by substantial evidence viewed in light of the record as a whole. We find the record evidence does not adequately support such a determination. Section 27-14-407, in pertinent part, reads:
If an injured employee knowingly engages or persists in an unsanitary or injurious practice which tends to imperil or retard his recovery, or if he refuses to submit to medical or surgical treatment reasonably essential to promote his recovery, he forfeits all right to compensation under this act.
As a general observation, we have said that the forfeiture statute "states a rule in regard to avoidable consequences. It was intended to prevent compensation for disability resulting from unreasonable conduct of the injured workman." Stanolind Oil & Gas Co. v. Harvey, 52 Wyo. 349, 356, 75 P.2d 1, 2 (1938) (referring to the substantially similar precursor to the current statute). It is the Division's burden to prove a claimant has forfeited his benefits under this statute. See Celotex Corp. v. Andren, 917 P.2d 178, 180 (Wyo.1996); Kilburn Tire v. Meredith, 743 P.2d 874, 876 (Wyo.1987); Stanolind Oil, 52 Wyo. at 356, 75 P.2d at 2.
[¶ 20] By this statute, the legislature has established two forms of conduct by which a claimant forfeits compensation. First, compensation is forfeited if a claimant "engages or persists in an unsanitary or injurious practice which tends to imperil or retard his recovery." Second, compensation is forfeited if a claimant "refuses to submit to medical or surgical treatment reasonably essential to promote his recovery." In the instant case, the hearing examiner determined Mr. Williams had engaged in both forms of conduct by "his refusal to allow the use of blood products to treat his lacerated spleen."
[¶ 21] In order to work a forfeiture of benefits for engaging or persisting in an unsanitary or injurious practice which tends to imperil or retard his recovery:
proof of more than a mere possibility is required.... We caution that more is required than proof of a mere potential for harm or a possibility of harm; there must be proof that the worker's acts were not benign, but did, in some way, contribute to recovery problems.
State ex rel. Wyoming Workers' Comp. Div. v. Bergeron, 948 P.2d 1367, 1370 (Wyo.1997). The proof in the instant case does not rise beyond a suggestion of the possibility of harm by the refusal to allow the use of foreign blood products. The critical evidence is Dr. Parnell's testimony. While she testified Mr. Williams would have had a better chance of survival with a transfusion of appropriate blood products, she never quantified his chance of survival in either event. Indeed, she repeatedly testified that she could not say whether Mr. Williams would have survived had blood products been transfused. For example, she testified Mr. Williams' injuries "could be fatal, despite our best efforts" and opined "whether or not he would have survived with or without blood products, I don't know that I can say." This testimony does not support a determination *1034 that Mr. Williams engaged in a practice that, in some way, contributed to his demise.
[¶ 22] For the same evidentiary reasons, the hearing examiner's determination that Mr. Williams refused to submit to medical or surgical treatment reasonably essential to promote his recovery also fails. The evidence in the record portrays a situation where Mr. Williams was critically injured and did not arrive at the hospital for an extended period of time. He had already lost a great deal of blood by the time he reached the hospital. He ultimately died. Dr. Parnell could not say that "this entire process would have been reversible." Therefore, under the specific facts of this case, the acceptance of the transfusion of blood products cannot be deemed to be "reasonably essential" to Mr. Williams' survival.

CONCLUSION
[¶ 23] The constitutionality of § 27-14-407 is not properly before this Court. As for the evidentiary issue, the Division needed to present positive evidence that Mr. Williams failed to survive because of his refusal to accept foreign blood products. It did not do so. The determination granting forfeiture of benefits is reversed. We remand the case to the district court with instructions that it reverse the order of the Office of Administrative Hearings and enter its order that the Division award the applicable death benefits to Mrs. Williams.
VOIGT, Chief Justice, dissenting.
[¶ 24] I respectfully dissent. The underlying facts are not in dispute, and there is not even a question as to whether the employee refused to submit to medical or surgical treatment. Of course he did. The only question is whether the treatment he refused was "reasonably essential to promote his recovery."[5] While the treating physician understandably was not willing to say that the employee's refusal to accept blood products, and his delay of surgery until his son's arrival, were the difference between life and death, she said everything just short of that. In that regard, it must be remembered that the statutory test, established by the legislature as the test to be applied in these situations, is not whether the refused treatment would have saved the employee's life. Rather, the test is, as just stated, whether the refused treatment was "reasonably essential to promote his recovery."
[¶ 25] I will not repeat at length the portions of Dr. Parnell's medical reports and testimony set forth in the majority opinion, but will note a few points that I believe clearly show that the refused treatment was just what the statute has in mind. Dr. Parnell's initial impressions included the observation that the employee "obviously" was suffering from "free intraabdominal bleeding." Dr. Parnell told the employee's son upon his eventual arrival that "the decision not to allow blood products, including whole blood, packed red blood cells, plasma, and/or platelets, cryoprecipitate, etc, may indeed make it very difficult to resuscitate and manage [the employee]." Because she was limited to the use of Cell Saver, Dr. Parnell was able to re-transfuse only two liters of the employee's blood, even though he had massive intraabdominal bleeding and had lost five liters of blood. It was Dr. Parnell's opinion that the employee essentially bled to death.
[¶ 26] Dr. Parnell's deposition testimony contains the following colloquies:
....
Q. Okay. In this case, if you'd been able to use whatever blood products you wanted to, would it have increased the likelihood of survival?
A. I think it would have increased the likelihood of survival. I could not have guaranteed survival.
....
Q. Well, let me ask you this: It changed your management, you would have used a different protocol; and just so *1035 I'm clear, that's notwhen you say it changed your management, it doesn't just mean that it might have made it more difficult to you or changed what you did, it changed your management in the sense that you didn't utilize what you would have otherwise considered optimal in terms of promoting recovery, correct?
A. I would have changed the timing of surgery. I probably would not have gotten all the CT scans, but I had time to do so because we were waiting on the son. And I would have taken him probably more directly to surgery, and I probably would have continued to use blood products throughout his course, whatever laboratory backup, you know, would have given me as to, you know, if the clotting factors are off or if platelet counts are low. I would have transfused those units.
But it was, like I said, a fork in the road. I went down a different fork, managed it the way that the patient requested, which is absolutely his right.
....
Q. Okay. And the inability to transfuse, to use blood products, reduced the likelihood of survival in this case, correct?
A. I think that that would have benefitted him, yes. Using blood products would have benefitted him.
Q. Okay. So it reduced the likelihood of survival?
A. Yes.
....
Q. ... by how much?
A. I don't know that I could ever quantify that, and I've said that before.
I think that I could not have guaranteed survival with an elderly gentleman like this with the fairly long transport time that he had, because I think he was out on I-80, if I remember correctly. It was kind of a long period of time.
He presented hypotensive. He had already bled quite a bit. I don't know that this entire process would have been reversible; but I agree with your statement that his odds of survival would have improved had I had all the arrows in my quiver, but I didn't.
[¶ 27] Dr. Parnell's observations were corroborated by Dr. Brausch, who provided a consultation at Dr. Parnell's request. Dr. Brausch indicated the following in her report:
This is a 67-year-old male status post motor vehicle accident who sustained a severe splenic injury and very significant blood loss. This severe hemorrhage, we are not able to replace with blood products and replacing at this point with saline, albumin and even hetastarch is not helping this patient. We have him on high doses of both Norepinephrine and Dopamine in addition to rapid infusion of IV fluids without benefit. He has received calcium times two and bicarbonate times three. We are all afraid that the patient is dying and we have used the resources we are allowed to use to their fullest extent.
[¶ 28] Admittedly, these snippets are taken from the larger context of the entire record, but there is sufficient evidence here from which the hearing examiner could determine that blood product treatment and immediate surgery were reasonably essential to promote the employee's recovery. When Dr. Parnell took the fork in the road mandated by the employee and his son, she clearly took the road less traveled. I would affirm the decision of the hearing examiner.
NOTES
[1] According to CCM's president, Howard Williams, also the Williamses' son, it was customary for CCM's maintenance technicians to use their personal vehicles when performing work outside of Cheyenne, and it was customary for Mr. and Mrs. Williams to travel together and share the driving when Mr. Williams journeyed out of Cheyenne to perform maintenance services.
[2] Cell Saver is the process of taking the "patient's own shed blood, cleaning it, processing it and then retransfusing it into the patient."
[3] The Division has not challenged this ruling on appeal.
[4] The Watchtower Bible and Tract Society of New York, Inc., having sought and obtained permission to participate in this case as amicus curiae, also endeavored to challenge the constitutionality of the statute as applied to Mr. Williams' refusal to accept blood products.
[5] The hearing examiner also concluded that the employee engaged in an injurious practice tending to impact his recovery, which is the first-stated test for forfeiture of benefits under the statute. While I agree that the employee's conduct also met this test, I believe these facts are more appropriately analyzed under the second-stated test of refusing to submit to medical or surgical treatment.