# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 1

### OCTOBER TERM, A.D. 2014

### January 6, 2015

|  |  |
|---|---|
| IN THE MATTER OF THE WORKER'S COMPENSATION CLAIM OF DAVID J. HARTMANN. <br><br> STATE OF WYOMING, ex rel., DEPARTMENT OF WORKFORCE SERVICES, WORKERS' SAFETY AND COMPENSATION DIVISION, <br><br> Appellant <br> (Respondent), <br><br> **v.** <br><br> DAVID J. HARTMANN, <br><br> Appellee <br> (Petitioner). | S-14-0105 |

*Appeal from the District Court of Campbell County*
The Honorable Michael N. Deegan, Judge

*Representing Appellant:*
 Peter K. Michael, Wyoming Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; Samantha Caselli, Assistant Attorney General.

*Representing Appellee:*
 Peter J. Timbers of Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KITE, Justice.**

[¶1]  The Office of Administrative Hearings (OAH) found that David J. Hartmann failed to prove a causal link between his dizzy spells and an earlier work injury.  Mr. Hartmann petitioned for review in district court, which held that the OAH failed to apply the second compensable injury rule and its decision was not supported by substantial evidence.  The district court reversed the OAH determination and remanded the case for reconsideration under the second compensable injury rule.

[¶2]  Rather than pursuing the case before the OAH, the Wyoming Workers' Safety and Compensation Division (Division) appealed to this Court claiming the district court's decision was in error.  We hold that the district court's ruling was not an appealable order.  However, we exercise our discretion to convert the notice of appeal to a petition for review.  We conclude the OAH failed to invoke and apply the applicable law.  We further conclude that when the applicable law is applied, the OAH decision to reject Mr. Hartmann's evidence is against the overwhelming weight of the evidence.  We affirm the district court's order to the extent it held the OAH failed to apply the second compensable injury rule but reverse the order remanding the case to the OAH for reconsideration.  Applying the second compensable injury rule, we hold that Mr. Hartmann was entitled to benefits.  We remand to the district court for an order remanding the case to the OAH for entry of an order awarding Mr. Hartmann benefits.

## ISSUES

[¶3]  The issues we consider are:

1.  Whether the district court's order is a final appealable order.

2.  Whether the OAH properly applied the applicable law.

3.  Whether the OAH findings and conclusions are supported by substantial evidence when the applicable law is applied.

## FACTS

[¶4]  On February 24, 2010, Mr. Hartmann was driving a 240-ton truck at the North Antelope Rochelle Mine in the course of his employment with Peabody Powder River Services, LLC when he was struck from behind by a shovel bucket.  His testimony that the shovel bucket was large enough to hold a couple of Volkswagen Beetles was undisputed.  The shovel bucket hit the headache rack, a protective steel barrier between the cab and bed of the truck.  Mr. Hartmann testified that when the shovel bucket hit the truck, his body went numb, he was nearly knocked unconscious and he did not know where he was for a short time.  He was taken to the emergency room where he

1

complained of neck pain. After an x-ray and CT scan, the emergency room physician diagnosed Mr. Hartmann with cervical strain and released him to return to work with the recommendation that he follow up in three to seven days with Dr. Lawrence Jenkins, a doctor Mr. Hartmann had previously seen for symptoms related to a C5-6 disc herniation.

[¶5] On March 4, 2010, Mr. Hartmann saw Dr. Jenkins. Mr. Hartmann reported that he was having persistent numbness and tingling in his arms as a result of the February 24, 2010, work injury. Dr. Jenkins concluded that the injury had exacerbated the C5-6 herniation. Expressing hope that the exacerbation was temporary, Dr. Jenkins advised Mr. Hartmann to take an anti-inflammatory daily, prescribed physical therapy and asked him to return in three weeks.

[¶6] On April 6, 2010, Mr. Hartmann saw Dr. Kenneth Pettine. Mr. Hartmann reported at that time that his neck symptoms had gotten much worse. Upon examining Mr. Hartmann, Dr. Pettine found:

> He has a 50% loss of cervical motion and pain to palpation in the paraspinal/suboccipital area with muscle spasm present. He has a positive Spurling's compression test. He had motor weakness and sensory changes in a C6 distribution. There is minimal evidence of intrinsic shoulder/elbow pathology but no evidence of acute skin changes, distal swelling or vascular changes.[1]

Dr. Pettine advised Mr. Hartmann there was a 90% chance his condition would improve within three months and prescribed an anti-inflammatory.

[¶7] Mr. Hartmann returned to Dr. Pettine's office on June 8, 2010, complaining of ongoing neck pain, headaches and interscapular pain. Comparing a new MRI to earlier MRIs, Dr. Pettine found "a definite disc herniation at C5-6." Dr. Pettine advised Mr. Hartmann that his options were to live with his symptoms or undergo surgery. He noted that Mr. Hartmann was "quite miserable and unable to work due to his symptoms" and "anxious to proceed with an artificial disc replacement in his cervical spine in an attempt to decrease pain and increase function."

[¶8] At a subsequent exam in October, 2010, Dr. Pettine reported that Mr. Hartmann's neck continued to be a problem – "[h]e has ongoing severe neck pain, headaches, interscapular pain and radiating arm pain." To address those issues, Dr. Pettine

---

[1] Dr. Pettine also noted Mr. Hartmann had "motor weakness and sensory changes in an L5 and S1 type distribution." To resolve that issue, Dr. Pettine performed a discectomy at L5-S1 in the summer of 2010. That injury is the subject of a separate workers' compensation case and is not at issue in this appeal.

performed a cervical disc replacement at C5-6. Up to this point, the Division paid benefits for the treatment related to the February, 2010 neck injury.

[¶9] In February, 2011, a year after suffering the compensable neck injury and four months after his surgery, Mr. Hartmann began experiencing dizzy spells. His primary care physician referred him to Dr. Angelo Santiago, a neurologist and neurophysiologist. After performing a neurological exam and testing, the results of which were normal, Dr. Santiago concluded Mr. Hartmann might be suffering from benign paroxysmal positional vertigo. He referred Mr. Hartmann to Kathy Blair, a doctor of physical therapy, board certified orthopedic clinical specialist and certified vestibular therapist, for further examination and treatment.

[¶10] Dr. Blair performed testing and determined that Mr. Hartmann did not have paroxysmal positional vertigo. After further testing and based upon Mr. Hartmann's history of neck problems, Dr. Blair concluded he was suffering from cervicogenic dizziness. Dr. Blair treated the condition with manual therapy, therapeutic exercises and needle point triggering. The treatment significantly lessened Mr. Hartmann's dizziness.

[¶11] In the meantime, Dr. Santiago had submitted bills to the Division for his treatment related to Mr. Hartmann's dizziness. The Division concluded Mr. Hartmann's dizziness was not related to his February, 2010, work injury and issued final determinations denying payment of Dr. Santiago's bills. Mr. Hartmann objected and requested a contested case hearing. After the hearing, the OAH concluded Mr. Hartmann did not meet his burden of proving his dizziness was related to his February 2010 work injury. However, the OAH concluded Dr. Santiago's testing was reasonable and necessary to rule out any serious cause of the dizziness and benefits should be awarded for the treatment he provided in March of 2011.

[¶12] Mr. Hartmann filed a petition for review in district court. After considering the parties' respective briefs and the record, the district court reversed the OAH's decision denying benefits for treatment for dizziness after Dr. Santiago's March 2011 examinations. The district court concluded the OAH had failed to apply the second compensable injury rule. The district court also noted that several of the OAH's findings appeared to be contrary to the overwhelming weight of the evidence. The district court remanded the case to the OAH for reconsideration of all issues under the second compensable injury rule. The Division appealed the district court's order to this Court.

## DISCUSSION

### 1. Appealable Order

[¶13] Before addressing the merits of the Division's appeal, we must first address whether the district court's order is appealable. The issue of whether the district court's

order is final and appealable is one of law subject to *de novo* review. *Northwest Bldg. Co., LLC v. Northwest Distributing Co., Inc.*, 2012 WY 113, ¶ 26, 285 P.3d 239, 245 (Wyo. 2012).

[¶14] Pursuant to W.R.A.P. 1.05, an appealable order is "an order affecting a substantial right in an action, when such order, in effect, determines the action and prevents judgment[.]" In *Schwab v. JTL Group, Inc.*, 2013 WY 138, ¶ 13, 312 P.3d 790, 794 (Wyo. 2013), we concluded the order from which the appeal was taken was not an appealable order. After an initial determination denying benefits, the Division issued a redetermination awarding benefits. *Id.*, ¶¶ 4-5, 312 P.3d at 792. The employer failed to object and request a hearing within the time the Division allowed. *Id.*, ¶ 7, 312 P.3d at 792. After the employer filed a late objection and hearing request, the Division referred the case to the OAH for hearing. *Id.* The employee filed a motion for summary judgment based upon the employer's untimely objection and the OAH granted it. *Id.* The employer appealed to the district court, which reversed and remanded the matter to the OAH for a hearing to determine whether the Division waived the deadline for the employer's objection and equitable estoppel applied to prevent enforcing the deadline. *Id.* ¶¶ 7-8, 312 P.3d at 793. Rather than pursuing the matter before the OAH, the employee appealed to this Court. *Id.*, ¶ 9, 312 P.3d at 793. We held the district court's order was not an appealable order because it did not determine the action as W.R.A.P. 1.05(a) requires; instead, the district court's order remanded the case to the OAH for further substantive proceedings. *Id.*, ¶ 13, 312 P.3d at 794. In reaching that result, we distinguished the district court's order remanding for a contested case hearing from an order instructing the OAH to perform the ministerial act of awarding or denying benefits.

[¶15] Like the order in *Schwab*, the district court's order here remanded the matter for further substantive proceedings, in this case reconsideration of all issues under the second compensable injury rule. The order did not, therefore, determine the action nor was it a ministerial act awarding or denying benefits. The district court's order is not an appealable order.

[¶16] In *Schwab*, this Court's conclusion that the district court's order was not an appealable order did not end the discussion. Rather, the Court exercised its discretion to convert the notice of appeal to a petition for writ of review under W.R.A.P. 13. The Court concluded the single issue presented was one of law and an appeal from the district court's order would materially advance resolution of the litigation. *Id.*, ¶ 14, 312 P.3d at 795. The Court similarly converted an appeal to a writ of review in *Stewart Title Guar. Co. v. Tilden*, 2005 WY 53, ¶ 7, 110 P.3d 865, 870 (Wyo. 2005) because the non-final order from which appeal was taken presented only questions of law fundamental to the action and immediate review by this Court was in the best interest of judicial economy. *See also In re General Adjudication of Water Rights*, 803 P.2d 61 (Wyo. 1990), in which this Court treated an attempted appeal as a petition for a writ of certiorari and *Kittles v.*

4

*Rocky Mountain Recovery, Inc.*, 1 P.3d 1220 (Wyo. 2000), where we treated a notice of appeal as a petition for writ of review.

[¶17]   We conclude immediate review of the district court's order by this Court would materially advance resolution of the case and is, therefore, in the interest of judicial economy.  We exercise our discretion to treat the notice of appeal as a petition for review and proceed to address the issues.

## 2.  *Second Compensable Injury Rule*

[¶18]  The Division asserts the district court was wrong when it concluded the OAH did not apply the second compensable injury rule in considering Mr. Hartmann's claim.  The Division contends that although the OAH did not use the phrase "second compensable injury", it applied the same analysis—whether Mr. Hartmann met his burden of proving that his dizziness was directly related to his prior work injury.[2]

[¶19]  On appeal from a district court order on petition for review of an administrative agency ruling, we review the case as though it came directly to this Court from the agency and give no deference to the district court's decision.  *Carson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 42, ¶ 11, 322 P.3d 1261, 1264 (Wyo. 2014), citing *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 76, ¶ 12, 233 P.3d 583, 586 (Wyo. 2010) and *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo. 2008).  Our review of an agency's decision is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2013), which provides in relevant part as follows:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.  The reviewing court shall:
> . . . .
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

---

[2] Mr. Hartmann does not address this issue but focuses his argument on the third issue—whether substantial evidence supports the OAH determination that he failed to meet his burden of proving his dizzy spells were related to his prior work injury.

Questions of law raised in an administrative context are reviewed by this Court *de novo*. *Voss v. Albany County Comm'rs*, 2003 WY 94, ¶ 9, 74 P.3d 714, 718 (Wyo. 2003). When an agency has not applied the correct rule of law, we correct the agency's error. *Id*.

[¶20] "The second compensable injury rule applies when an initial compensable injury ripens into a condition requiring additional medical intervention." *Hoffman v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2012 WY 164, ¶ 9, 291 P.3d 297, 301 (Wyo. 2012), quoting *Alvarez v. State ex rel. Wyo. Workers' Comp. Div.,* 2007 WY 126, ¶ 18, 164 P.3d 548, 552 (Wyo. 2007). "Under the second compensable injury rule, a subsequent injury or condition is compensable if it is causally related to the initial compensable injury." *Id*. As with claims for benefits arising from an initial injury, an employee claiming entitlement to benefits under the second compensable injury rule has the burden of proving "a causal connection exists between a work-related injury and the injury for which worker's compensation benefits are being sought." *Hoffman*, ¶ 9, 291 P.3d at 301, quoting *Davenport v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 6, ¶ 21, 268 P.3d 1038, 1044 (Wyo. 2012). The causal connection requirement is satisfied upon showing that it is more probable than not that the initial work injury and the subsequent injury are related. *Kaczmarek v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2009 WY 110, ¶ 11, 215 P.3d 277, 282 (Wyo. 2009), citing *Pino v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 996 P.2d 679, 685 (Wyo. 2000).

[¶21] In ruling on Mr. Hartmann's claim, the OAH stated the issue for its determination was whether Mr. Hartmann "can prove that his current complaints of dizziness are directly related to his February 24, 2010 work injury." However, the OAH cited the following "general principles of law" applicable to its determination:

1. The claimant bears the burden of proving the essential elements of his claim by a preponderance of the evidence, including that the claimed injury arose out of and in the course of employment. *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div*. 2002 WY 91, ¶ 27, 49 P.3d 163, 174 (Wyo. 2002).

2. The claimant must prove, by a preponderance of the evidence, the injury arose out of the employment and was suffered in the course of employment while at work on the employer's premises.

3. A causal connection must exist between the injury and the employment.

4. A causal connection exists when there is a nexus between the injury and some condition, activity, environment or requirement of the employment. *Haagensen v. State ex rel. Wyo. Workers' Safety & Comp. Div*., 949 P.2d 865, 867 (Wyo. 1997).

5. "'Injury' means any harmful change in the human organism other than normal aging … arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extrahazardous duties incident to the business. 'Injury' does not include:

. . . .

(F)    Any injury or condition preexisting at the time of employment with the employer against whom a claim is made;

(G)    Any injury resulting primarily from the natural aging process or from the normal activities of day-to-day living, as established by medical evidence supported by objective findings[.]" Wyo. Stat. Ann. § 27-14-102(a)(xi)(F) and (G).

[¶22]  From the general legal principles cited, we cannot conclude the OAH applied the second compensable injury rule.  Nor are we able to conclude that although it did not reference the rule, the OAH nevertheless applied the analysis required under the rule. While the OAH ruling correctly states that Mr. Hartmann had the burden of proving all the essential elements of his claim by a preponderance of the evidence, he did not under the second compensable injury rule have to prove that the dizziness for which he was seeking benefits "arose out of and in the course of his employment" as stated in subparagraph 1 of the ruling. Rather, he had to prove that the dizziness was more probably than not related to his earlier compensable neck injury.

[¶23]  Mr. Hartmann also did not have to prove that the dizziness "was suffered in the course of employment while at work on the employer's premises" as stated in subparagraph 2 of the agency ruling.  Additionally, rather than proving a causal connection between the dizziness and his employment as stated in subparagraph 3, Mr. Hartmann had to prove a causal connection, or nexus, between the dizziness and his earlier compensable neck injury.  He was not required to prove a nexus between the dizziness and "some condition, activity, environment or requirement of the employment." Finally, the definition of "injury" found in § 27-14-102(a)(xi), requiring as it does that the injury occur "while at work" applies to an initial work injury, not to a second compensable injury.  Wyoming law is clear that a second compensable injury need not occur at work.  *Pino*, 996 P.2d 679 (earlier compensable work injury was direct cause of ruptured disc that occurred at home nearly two years later); *Carabajal v. Wyo. Workers' Safety & Comp. Div.,* 2005 WY 119, ¶¶ 4, 14, 119 P.3d 947, 948, 952 (Wyo. 2005), (claimant was entitled to opportunity to prove 1977 compensable work injury was direct cause of second compensable injury rule sustained in 2002 when he was not at work); *Hoffman*, ¶ 17, 291 P.3d at 303, (claimant satisfied his burden of proving a causal connection between his 1994 work injury and the injury he sustained in a slip and fall at home fifteen years later).

[¶24] As we have said, the OAH "has an obligation to invoke and apply the rules of law that support a claimant's theory of the case." *Pino*, 996 P.2d at 687. The OAH in Mr. Hartmann's case should have invoked and applied the second compensable injury rule as this Court has defined it. From the general legal principles cited in its ruling, we are unable to conclude that the OAH invoked the applicable rule or that the decision is "in accordance with law."

[¶25] In previous cases in which we have concluded the OAH failed to invoke and apply the applicable law, we have sometimes remanded the case to the OAH for reconsideration in light of the applicable law. *Carabajal*, ¶ 24, 119 P.3d at 955; *Yenne-Tully v. Wyo. Workers' Safety & Comp. Div.,* 12 P.3d 170, 173 (Wyo. 2000) (*Yenne-Tully I*). In other cases, after determining the OAH applied the wrong standard or rule, we have considered whether, when the proper standard or rule is applied, the evidence in the record supports the claim for benefits. *Pino*, 996 P.2d at 687; *Hoffman*, ¶ 13, 291 P.3d at 302. Having considered the record in Mr. Hartmann's case, we conclude as explained fully in the following section that the medical testimony sufficiently tied his dizziness to the earlier compensable injury. We, therefore, decline to remand the case to the OAH for reconsideration in light of the second compensable injury rule.

### 3. *Substantial Evidence*

[¶26] Pursuant to § 16-3-114(c), we review an agency's findings of fact to determine whether they are supported by substantial evidence. *Johnson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2014 WY 33, ¶¶ 12-13, 321 P.3d 318, 321-22 (Wyo. 2014), citing *Dale*, ¶ 22, 188 P.3d at 561. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*, citing *Bush v. State ex rel. Wyo. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005). Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for the findings. *Id*. When an agency concludes a claimant failed to satisfy his burden of proof, we:

> decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether

8

the agency could reasonably conclude as it did based on all the evidence before it.

*Johnson*, ¶ 13, 321 P.3d at 322, quoting *Dale*, ¶ 22, 188 P.3d at 561.

[¶27]   In support of his claim that his dizziness was related to his February, 2010, work injury, Mr. Hartmann offered the testimony of Dr. Blair.   She testified that from her initial evaluation she arrived at a working diagnosis that Mr. Hartmann's cervical region was the source of his symptoms.   Subsequently, she diagnosed him with cervicogenic dizziness.   According to Dr. Blair's testimony, there are a variety of causes of cervicogenic dizziness, including vascular issues, arthritis or any trauma to the cervical spine, but a patient cannot have cervicogenic dizziness unless there is some problem with the cervical spine.   She testified that Mr. Hartmann came to her with symptoms of cervicogenic dizziness following a neck injury and surgery for that injury, she treated him for cervicogenic dizziness and his symptoms resolved.   She also testified that her treatment of Mr. Hartmann was more likely than not related to his 2010 neck injury.

[¶28]   Mr. Hartmann also presented the deposition testimony of Dr. Santiago.   Like Dr. Blair, Dr. Santiago testified that cervicogenic dizziness usually follows a neck or upper cervical spine injury.   He testified there are two hypotheses as to the cause, compression of the blood vessel when the neck is turned or diminished sensation of the joints and nerves from the neck to the brain.   In either case, he said, cervicogenic dizziness usually follows a neck injury.   Although Dr. Santiago did not diagnose Mr. Hartmann as having cervicogenic dizziness, he testified that Dr. Blair "is probably the best physical therap[ist] that I know of, especially for this kind of problem, and I always take into consideration her . . . skills and . . . her diagnostic ability."   He testified further that he valued Dr. Blair's input and would go with her recommendations as to what Mr. Hartmann needed.   Addressing the other possible causes of Mr. Hartmann's dizziness, Dr. Santiago testified that he obtained MRIs of Mr. Hartmann's brain and internal auditory canals and performed a neurological examination and, on the basis of the results of those tests, he ruled out a stroke, abnormal blood vessels, a brain tumor, arthritis and other potential causes of the dizziness.

[¶29]   Mr. Hartmann also presented the deposition testimony of Dr. Pettine.   He testified that he is not an expert on dizziness and could only speculate as to what caused Mr. Hartmann's dizziness.   He also testified that while it might be possible for dizziness to be a by-product of the surgery he performed on Mr. Hartmann, he did not recall any other patient having dizziness after the surgery.

[¶30]   From the above testimony, Mr. Hartmann established that his symptoms were consistent with cervicogenic dizziness; cervicogenic dizziness usually follows a neck injury; cervicogenic dizziness does not occur absent cervical problems; other potential causes for the dizziness were ruled out; dizziness is not a usual by-product of cervical

disk surgery; and, the treatment Mr. Hartmann received for his dizziness was more likely than not related to his February, 2010, compensable work injury. Our task is to determine whether there is substantial evidence to support the OAH's decision to reject this evidence. In making that determination, we consider whether the OAH's decision was contrary to the overwhelming weight of the evidence in the record as a whole.

[¶31] The OAH's determination that Mr. Hartmann did not meet his burden of proof appears to have been based in part on a lack of confidence in Dr. Blair's qualifications and opinions. This Court will defer to a fact finder's credibility determinations, but only where those determinations are supported by a rational premise. *McMasters v. State of Wyo. ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 32, ¶ 71, 271 P.3d 422, 439 (Wyo. 2012), citing *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶ 30, 232 P.3d 1, 9 (Wyo. 2010). In the present case, the OAH noted twice in its ruling that "most" or "much" of the work Dr. Blair did to obtain her doctorate degree was on-line and she wrote only "some" of the papers on campus.

[¶32] In her deposition, Dr. Blair testified about her qualifications as follows:

> Q. And how long have you been a physical therapist?
> A. 20 years.
> Q. And where did you do your undergraduate work?
> A. Ithaca College.
> Q. In New York?
> A. Yes.
> Q. . . . And . . . did you do any education after your undergraduate degree?
> A. Yes, in 2009 I got a doctoral degree.
> Q. You say you're a doctor of physical therapy?
> A. Yes.
> Q. What does that mean? . . .
> A. It's just a higher level of education. It's a clinical degree, more hours, more training, more education.
> Q. Okay. So should I refer to you as doctor?
> A. You could. You don't need to.
> Q. All right. Do you have any specialties?
> A. . . . I specialize in vestibular treatment for dizziness.
> . . . .
> Q. Could you explain what exactly you mean by that?

A. Well, I've taken numerous advance trainings in understanding, helping diagnose and treat a variety of vestibular disorders.

[¶33] At the hearing, Dr. Blair testified on direct exam:

Q. Do you have any specialties in physical therapy?
A. I'm a board certified orthopedic clinical specialist. . . . I'm a certified vestibular therapist.
. . . .
Q. Dr. Blair, you have a doctorate in physical therapy?
A. Yes.
Q. Could you explain to the court what exactly that means?
A. It's a clinical degree, so it's advanced training. I originally graduated with a bachelor's of science, and then I went on further education to get the doctorate. It's a separate pathway from a PH.D. pathway, again, staying more clinical versus educational.
HEARING EXAMINER . . .: Where did you get that degree?
A. Regis University in Denver.

[¶34] At the close of her testimony the following exchange occurred:

HEARING EXAMINER . . .: All right. Thank you, Dr. Blair. I'm curious how long did it take you to get that doctorate degree?
DR. BLAIR: I did it part time while running my clinic, so it took about two and a half years.
HEARING EXAMINER …: Normally it would take less than that?
DR. BLAIR: It depends on how many credit hours. Since I already had my PT degree, I didn't have [to] go back to a campus situation full time, so I was able to just take as many credit hours per semester as I felt I could handle.
HEARING EXAMINER . . .: Did you do a lot of it online?
DR. BLAIR: Online. Depending on the course we had to be down at Regis for intensive – lots of papers, lots of research.

11

[¶35]   The above excerpts are the full extent of the evidence concerning Dr. Blair's education and certifications.  No evidence was presented to show that her work to obtain her doctorate, or the degree itself, were suspect.  No evidence was presented to show that her treatment of Mr. Hartmann or her opinions were subject to doubt.  To the contrary, the evidence showed only that Dr. Santiago considered her to be probably the best physical therapist he knows, especially for symptoms like Mr. Hartmann was having, that he always takes her skills and diagnostic ability into account and that he valued her input and would go with her recommendations. Applying the proper standard of review, we can find no rational basis for the OAH discounting Dr. Blair's testimony based upon its suspicions regarding her credentials.

[¶36]   The OAH also noted in its ruling that Dr. Blair's records contained a patient discharge note which identified Mr. Hartmann as the patient but obviously described the complaints of a different patient and she failed to correct the record before providing it. The OAH stated "[t]his situation had a negative effect on the confidence this Hearing Examiner can place on Dr. Blair's medical records."  Dr. Blair was not questioned about the discharge note or given a chance to explain it.  It is not clear that she even knew about it.  We conclude that particular record does not provide a rational basis for entirely discounting her opinions.

[¶37]   The OAH also discounted Dr. Blair's testimony because Dr. Pettine's office note stated the etiology of Mr. Hartmann's dizziness was unknown.  In his deposition, however, Dr. Pettine testified that he is not an expert in dizziness and any opinion from him concerning the cause of Mr. Hartmann's dizziness would be speculative.  In light of this testimony, his office note carries little, if any, weight and cannot be considered substantial evidence necessary to support the OAH decision.

[¶38]   The OAH also relied on testimony by Dr. Santiago to the effect that the diagnosis of cervicogenic dizziness is controversial, Mr. Hartmann did not have symptoms that are definitely associated with cervicogenic dizziness, and people with cervicogenic dizziness can also have positional vertigo, which Dr. Blair concluded Mr. Hartmann did not have. Dr. Santiago was asked on cross-examination whether his testimony on direct that the diagnosis of cervicogenic dizziness was controversial meant that it is not a generally accepted diagnosis.  He testified to the contrary that there are some symptoms that are definitely cervicogenic such as facial numbness, double vision or difficulty swallowing on neck turning.  He testified that Mr. Hartmann did not have any of those symptoms and his presumptive diagnosis, therefore, was that Mr. Hartmann had positional vertigo. However, that testimony was substantially weakened by his testimony that Dr. Blair is probably the best physical therapist he knows, she sees far more patients for dizziness than he does and he would go with her recommendations.  Similarly, Dr. Santiago's testimony that people with cervicogenic dizziness can also have positional vertigo did not undermine Dr. Blair's testimony that Mr. Hartmann did not have positional vertigo.  The

evidence was that positional vertigo <u>can</u> be a symptom of cervicogenic dizziness not that it is <u>always</u> a symptom.

[¶39]   The OAH also stated as a basis for its ruling that Dr. Santiago continued to diagnose Mr. Hartmann with positional vertigo even after being informed of Dr. Blair's diagnosis.  However, Dr. Santiago saw Mr. Hartmann only twice in March, 2011.  He emphasized that his diagnosis of positional vertigo at that time was "presumptive," meaning "probable" rather than final or conclusive.  He testified that at the time of the second visit, his diagnosis remained positional vertigo.  He was not aware until his deposition was taken sixteen months later that Dr. Blair has diagnosed Mr. Hartmann with cervicogenic dizziness.  After being informed of that diagnosis, he was not asked and did not testify whether he still believed Mr. Hartmann was suffering from positional vertigo.  He did testify, however, that he does not see cervicogenic dizziness as commonly as Dr. Blair probably does, she sees more patients with dizziness than he does, she is probably the best physical therapist he knows and he would go with her recommendation.  This testimony suggests that Dr. Santiago would have deferred to her diagnosis.  In any event, Dr. Santiago was not asked whether he continued to believe Mr. Hartmann had positional vertigo after being informed of Dr. Blair's diagnosis.

[¶40]  The OAH concluded the medical opinions were in conflict because, while Dr. Blair testified that her treatment was related to the work injury, both Dr. Pettine and Dr. Santiago testified that they could only speculate about whether Mr. Hartmann's dizziness was related to the work injury.  The OAH gave greater weight to Dr. Pettine's testimony despite his admission that he is not an expert in dizziness, did not treat Mr. Hartmann for dizziness and was not qualified to express an opinion concerning the cause of the dizziness. The OAH gave greater weight to Dr. Santiago's testimony despite the fact that after ruling out other more serious causes for the dizziness, he referred Mr. Hartmann to Dr. Blair for further evaluation and treatment because she was probably the best physical therapist he knew, particularly for treating this condition.  The record simply does not support giving greater weight to the testimony of Dr. Pettine or Dr. Santiago than to Dr. Blair's testimony.

[¶41]   In its ruling, the OAH stated that Mr. Hartmann appeared impatient and had difficulty containing his anger at times, walked into the hearing room without any apparent difficulty, showed no signs of problems with his neck or shoulder movements, did not appear to be in pain and gave testimony not supported by the medical records when he said Dr. Jenkins had told him there was nothing wrong with him.  We have said before that a claimant's appearance of anger is of little significance in workers' compensation determinations. *Moss*, ¶ 31, 232 P.3d at 9.  Additionally, given that Mr. Hartmann made no claim that his dizziness was continuing at the time of the hearing, the OAH's observations about his appearance have no significance.  The observation that he did not appear to be in pain is particularly insignificant since Mr. Hartmann never

complained of having pain. By itself, Mr. Hartmann's testimony that Dr. Jenkins told him there was nothing wrong with him is not sufficient to discredit his testimony entirely.

[¶42] Finally, the OAH made two observations in its ruling that do not support the outcome. First, it said that Mr. Hartmann's symptoms recur, indicating that Dr. Blair's treatment may not be resolving his dizziness. The undisputed evidence presented at the hearing showed that Dr. Blair's treatment significantly reduced Mr. Hartmann's symptoms, making it possible for him to walk, drive and function, which he was unable to do before seeing Dr. Blair. Second, commenting on a note from April, 2012, in which Dr. Blair stated that Mr. Hartmann displayed neurological signs, including feeling like his ankles might buckle, tremors, numbness in his hands and dizziness, the OAH speculated that something more serious was wrong with him. This suggestion is pure speculation unsupported by any medical opinion and is not a rational basis for denying benefits.

[¶43] Mr. Hartmann met his burden of proving his dizziness was more probably than not related to his February, 2010, work injury under the second compensable injury rule. The OAH's ruling to the contrary is against the overwhelming evidence in the record as a whole.

[¶44] We reverse the district court's order remanding to the OAH for reconsideration and remand to the district court for entry of an order remanding to the OAH for entry of an order awarding benefits.

14